IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | Case No. CR-24-436-G |
| | ) | |
| SHAIVE WILLIS, | ) | |
| | ) | |
| Defendant. | ) | |

* * * * * * *

TRANSCRIPT OF

ELECTRONICALLY-RECORDED PROCEEDINGS

HAD ON OCTOBER 30, 2024

BEFORE THE HONORABLE SHON T. ERWIN

U.S. MAGISTRATE JUDGE, PRESIDING

* * * * * * *

DETENTION HEARING

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

CHRISTINA L. CLARK, RPR, CRR
United States Court Reporter
200 N.W. Fourth Street, Suite 5419
Oklahoma City, Oklahoma 73102
christina_clark@okwd.uscourts.gov - ph(405)609-5123

A P P E A R A N C E S

ON BEHALF OF THE GOVERNMENT:

Mr. Stephen C. Hoch
Assistant United States Attorney
U.S. Attorney's Office
210 West Park Avenue
Suite 400
Oklahoma City, Oklahoma 73102

ON BEHALF OF THE DEFENDANT:

Mr. Benjamin R. Hilfiger
COOK AND HILFIGER
417 West Broadway
Muskogee, Oklahoma 74401

# I N D E X


**PAGE**

EVIDENCE ON BEHALF OF THE GOVERNMENT:

TIMOTHY SPRATT
Direct Examination by Mr. Hoch ...............6
Cross-Examination by Mr. Hilfiger ............12

GOVERNMENT RESTS ..................................14

PROFFER BY MR. HILFIGER ...........................14

DEFENDANT RESTS ...................................20

CLOSING ARGUMENT BY MR. HOCH ......................20

CLOSING ARGUMENT BY MR. HILFIGER ..................23

RULING OF THE COURT ...............................27

CERTIFICATE OF REPORTER ...........................35

**P R O C E E D I N G S**

(The following proceedings were had October 30, 2024, with Court, counsel, and parties present:)

THE COURT: We are here for Case No. CR-24-436, USA vs. -- okay. I wasn't here for initial appearance, so Shy-eve?

THE DEFENDANT: What's that?

THE COURT: It's Shy-eve Willis?

THE DEFENDANT: Yes.

THE COURT: Okay. All right. Shy-eve. Let me get that right. All right. For the detention hearing.

Government has moved for detention. This is a rebuttable presumption case, so we've got to deal with that at some point.

So what we're about to have, Mr. Willis, is a hearing under the Bail Reform Act. The purpose of this hearing is to determine whether you're to be released or detained pending further court proceedings.

Pretrial liberty is the norm, and detention prior to trial is a carefully limited exception. The rules concerning the admissibility of evidence at criminal trials won't apply to the presentation and consideration of information at this hearing.

And the most important thing is you remain entitled to the presumption of innocence. So this hearing is not about

whether you're guilty or not guilty of the offense charged. It's just about where you're going to be while you are waiting for your trial. Are you going to stay in custody or are you going to get released on conditions? And my job is to try and find a way to get you released.

Given the Indictment, there's probable cause to believe that you've committed a crime, the crime of drug conspiracy under Title 21 of the United States Code Section 846, which entitles the government to a presumption in favor of detention.

The presumption bases a burden of production, not persuasion, on you as the defendant. The presumption may be rebutted by any credible evidence offered. The burden of persuasion remains with the government.

So for me to order that you remain in jail, the government must establish by clear and convincing evidence that you present a danger to others and to the community if released.

Or the government must establish by preponderance of the evidence -- that is, more likely than not -- that there are no conditions of release that will reasonably assure your appearance as required.

So a little bit of an explanation as to what's going to be going on over the next several minutes.

All right. Anyway, we've got Stephen Hoch, Assistant

United States Attorney for the government. Ben Hilfiger for the defense.

Mr. Hilfiger, you're CJA out of Muskogee?

MR. HILFIGER: Yes, your Honor.

THE COURT: Okay. Well, welcome to the Western District where we don't have trees or navigable waters.

All right. In that it's your burden, Mr. Hoch, you may make opening statement or just get started with your witness.

MR. HOCH: Thank you, your Honor.

The United States calls DEA Task Force Officer Tim Spratt.

(The witness was duly sworn.)

THE CLERK: Please have a seat.

**TIMOTHY SPRATT,**

called as a witness herein, having been first duly sworn, was examined and testified as follows:

**DIRECT EXAMINATION**

BY MR. HOCH

Q Please state your name.

A Timothy Spratt.

Q And where do you work?

A I'm currently employed by McClain County Sheriff's Office. My current assignment is with the Drug Enforcement Administration as a task force officer.

Q And how long have you been with DEA?

A Since April of 2023.
Q What type of crimes do you investigate in that role?
A Federal drug offenses.
Q We're here today for a detention hearing for Shaive Willis. Are you familiar with Mr. Willis?
A I am.
Q Now, Mr. Willis has been charged, as the Judge indicated, in an Indictment as being a member of the Smith DTO charged with a violation of 21 United States Code Section 846.
Are you familiar with the Smith DTO?
A I am, yes.
Q When did law enforcement become familiar with the Smith DTO?
A In its entirety, law enforcement became familiar with the Smith Drug Trafficking Organization in approximately June of 2022.
Q Can you describe the structure of the Smith DTO?
A Yeah. Commonly, the way this drug trafficking organization works is Mr. Smith directs members of this drug trafficking organization at several levels. Just below him are trusted members who commonly handle money and organization of the group. And then below him -- or below them would be retail-level dealers and couriers making trips to pick up narcotics.
Q So how, primarily, does the Smith DTO operate?

A At the direction of Mr. Smith.

Q And what are some of the actions that law enforcement has observed during the course of this conspiracy?

A Other members of this DTO have made -- commonly make trips out of state -- Arizona and California -- to pick up narcotics and bring back to Oklahoma where they're distributed to retail-level dealers and other couriers to move them around the state.

Q And where was Marielle Smith, the leader of this DTO, located during the course of this conspiracy?

A The Department of Corrections in Oklahoma.

Q Can you explain how he was operating this organization while incarcerated?

A Most commonly through the use of contraband cell phones.

Q Did you have an opportunity to review these contraband phones during the course of your investigation?

A Yes. Several phones were seized from Mr. Smith throughout the course of this investigation, forensically downloaded, and I reviewed most of that information.

Q What did you discover while reviewing these phones as it relates to Mr. Willis?

A That commonly Mr. Willis is referred to in messages with other members of the DTO. There are communications between Mr. Willis and Mr. Smith, screenshots of pictures of communications between Mr. Willis and other members of the

DTO, and that Mr. Smith had given Mr. Willis' information, to include his address, to other members of the DTO in order to facilitate the pickup of narcotics.

Q So fair to say they were messages, essentially, between Smith and customers of the Smith DTO as well as messages between Smith and Willis?

A Yes, both.

Q Okay. I want to shift gears a little bit.

During the course of this investigation, has law enforcement had the opportunity to sit down for proffer interviews with cooperating coconspirators?

A Yes. On --

Q And --

A -- several occasions.

Q And what about confidential sources?

A Yes.

Q So to ensure continued protection, I'm going to ask some general questions regarding information that law enforcement has received from these coconspirators and/or confidential sources. And I'm going to anonymize them during that process.

But first I want to ask you about Coconspirator 1, or CC1. Did CC1 identify other members of the Smith DTO?

A Yes. They identified several members of the Smith DTO that they had done business with during the course of their involvement with the drug trafficking organization.

Q Who specifically did CC1 identify as members of the Smith DTO?
A Mr. Willis, other members that are named in the Indictment, Lasasha Johnson, Leah Melrose, among others.
Q And was law enforcement able to independently verify and corroborate the information that CC1 provided during the course of this proffer?
A Yes.
Q What did CC1 identify Mr. Willis' role in the Smith DTO to be?
A Their direct involvement with Mr. Willis, according to them, included them driving to Oklahoma City and picking up approximately 10 kilograms of methamphetamine from him on one occasion, and on a separate occasion picking up cash that they believed to be drug proceeds from him.
Q Okay. I want to next ask you about CC2. Did CC2 identify members of the Smith DTO during a proffer session?
A They did, yes.
Q And did they indicate whether Mr. Willis was involved in the Smith DTO?
A They did, yes.
Q What did CC2 describe Mr. Willis' role as?
A That he was a retail-level dealer and courier between Oklahoma City and Lawton directed by Mr. Smith.
Q Okay. I want to turn and ask you about information

received from a confidential source. I will refer to that confidential source as CS1.

Did CS1 identify members of the Smith DTO?

A Yes.

Q And did CS1 name Mr. Willis as a member?

A They did.

Q What did CS1 describe Mr. Willis' role to be?

A That he was a retail-level dealer, and at the time that they knew him by his street name of Bugatti. They then identified a picture of Mr. Willis, that that is who they were referring to and that he was a retail-level dealer in Oklahoma City operating under the direction of Mr. Smith.

Q Okay. So, to summarize, there were three independent sources that named Mr. Willis as a member of the Smith DTO; correct?

A Yes.

Q And that's in addition to the information you reviewed on the phones?

A Correct.

Q And has law enforcement been able to independently verify and corroborate the information that was provided by these coconspirators or confidential source?

A Yes. In a combination of review of evidence and the information provided by cooperators.

MR. HOCH: I'll pass the witness, your Honor.

THE COURT: All right.

Cross-examination, Mr. Hilfiger?

**CROSS-EXAMINATION**

BY MR. HILFIGER

Q Officer Spratt, it seems that at least two of these three identified Mr. Willis as a retail-level dealer; is that correct?

A That's correct.

Q And that would be considered one of the -- from your tiers, I guess, if you have Willis, he would be the bottom tier as far as how you identified them?

A Yes. They identified him as a multi-kilo-level dealer.

Q Okay. But as far as this DTO, it seemed that he was a retail dealer --

A Correct.

Q -- correct?

And you just stated there's corroboration from review of the evidence. What specific evidence was reviewed that corroborated?

A The review of those -- of multiple cellular telephone downloads.

Q Was one of them Mr. Willis' cell phone?

A No.

Q Do you have Mr. Willis' cell phone?

A I do.

Q Have you reviewed it?
A I have not yet.
Q Is there a search warrant pending for his cell phone?
A I believe it was signed yesterday.
Q Okay.
A Or this morning.
Q So there's no information from his cell phone?
A Not from his, no.
Q Okay. So the only information you have that may result in his communications would be from Mr. Smith's cell phones?
A Mr. Smith and other cooperating defendants.
Q Okay. And those cell phones or any communications would show that Mr. Smith would be the head of the DTO --
A Correct.
Q -- correct?
And he was providing -- or I don't know if I would say "providing" -- he would be the one that is directing others?
A Correct, yes.
Q There's no -- seems to be no information that Willis was directing anybody?
A Yeah. No evidence to that effect.
Q Okay.
MR. HILFIGER: Pass the witness, your Honor.
THE COURT: All right.
Any additional direct examination of this witness,

Mr. Hoch?

MR. HOCH: No, your Honor.

THE COURT: You may step down.

THE WITNESS: Thank you.

THE COURT: And the government may call its next witness.

MR. HOCH: Government would rest at this time, your Honor.

THE COURT: All right.

Are there witnesses or a proffer from the defense, Mr. Hilfiger?

MR. HILFIGER: Your Honor, I would just proceed by proffer.

THE COURT: Certainly.

MR. HILFIGER: Your Honor, if I may, I'd ask the Court take judicial notice of the pretrial services report provided yesterday, specifically that it does go through all of Mr. Willis' criminal history.

But, specifically as far as the proffer, we would proffer that there is a place for him to go. There's actually a couple of places for him to go. One would be in Lawton. One would be in Lubbock, Texas.

I think the -- kind of the consensus, at least of Mr. Willis' family, is that he go to Lubbock, Texas, with his mother, as opposed to Lubbock with his grandmother.

THE COURT: That's Lawton with his grandmother.

MR. HILFIGER: Lawton is where he grew up with his grandmother. There was an issue with -- many years ago, Mr. Willis' brother was murdered in Lawton, and they've tried to stay away from Lawton. But there is a place for him to go there. And that murder is unrelated to this case and anything else that he's done. But there is a place for him to go, a safe place.

Mr. Willis would testify that he is employed, that he has been employed, he has a -- while he's new at this particular job, he would say that he has maintained stable employment with a decent income.

He has a child with a wife that he is -- not a wife but another woman that he has been with for a number of years and lived with for a number of years.

He would also point out that we have reviewed the -- there are conditions available. And we understand that there are pending cases, but one of the things that he would be willing to do -- and I'm not trying to get into argument at this point, but his criminal history, there -- it is there. But he would also point out that it is predominately juvenile. Anything as an adult would be fairly minor.

And being a 29-year-old, we would look at his alcohol and drug use, which also would appear to be fairly minor.

THE COURT: Can you tell me about his job? I know

that it's Titan Professional Resources and would require him to travel.

MR. HILFIGER: So he's described that as an IT type of job. He says that he'll be able to keep that job. Now, with this report, I haven't been able to talk to him if he is able to keep that job and work from home in Lubbock or Lawton, but I think that that would be possible.

I think, with his work history, he would be able to get a job at either place if he's not able to keep that job. But he does travel fairly regularly for that job.

THE COURT: But does somebody drive him? I notice he's got a DUI and a DUS case, both pending, so I would imagine that his license may be a little jacked up right now.

MR. HILFIGER: I believe his license, at least according to the criminal history, is under suspension. I have not checked to see if it is currently under suspension. I haven't seen anything to show me that it is current or not.

Getting back and forth, I believe that there's -- he has employees -- or co-workers that can help get him back and forth, family members. That doesn't seem to be a problem.

He does own a vehicle. It's a 2009 truck, and now I forget which kind of truck it is. But I've asked him the condition of it, and it is a drivable -- it's in a good-condition vehicle. So the ability to get back and forth from -- whether it's Lawton or Lubbock, that would not be an

issue.

He would also proffer that, along with the conditions that have been proposed, that he would also want to be able to take care of the pending cases that he has, which I believe they are traffic tickets in Oklahoma County and then misdemeanors in Cotton County, to resolve some of these issues. But some of that stuff, I think, can be handled pretty quickly and efficiently once he's out and he has the ability to do that.

He has the money to do that. He has the employment to continue working -- or he has the ability to continue working or to get a new job. I think that would have to be a condition that the Court would want to consider based on where he is actually located, because I don't know what his job status is going to be if he has to move to Texas, but I think there's a chance that he could work from home there.

The drug use, I think I did touch on that. His drug use is minimal. The Percocet, I believe that that is prescribed. He is not an addict. He takes it for a specific reason.

THE COURT: What reason is that?

MR. HILFIGER: Back pain. I don't know where the back pain stemmed from, but he had back pain. And it was a month ago.

Marijuana, he does appear to be a heavy user. Alcohol, I don't think that would be an issue, but he does agree with the

condition of abstaining from alcohol and any illegal drugs. But if he's prescribed something, he would take that solely as prescribed.

He has the mental and physical health to -- I guess he would proffer, he would testify that there is no issue with his mental health. He has never been adjudicated incompetent. He's never had any issues with mental health diagnoses.

And I think he would also proffer that, as stated in here, there's no passport. He has no ability to leave the country.

Now, we are -- part of our request would be that he go to Lubbock, Texas. He has rarely left the state of Oklahoma for any kind of social activity. It's all been work related. And so he is -- does have strong ties here, as he has -- he would testify there is a child here, there is, I believe, a pending child here, and his social network, his mother of his children is here, and his ties to the community would be here.

Now, that would be a little contention if he were to go to a different state, but I think that's something that could be workable between him personally.

THE COURT: Does he have two children or one?

MR. HILFIGER: I believe he has one child and one on the way.

THE COURT: Okay. The child he has was the one with Ms. Pollard?

MR. HILFIGER: That was Janhae; is that right?

THE COURT: Barnes?

MR. HILFIGER: I have Janhae Johnson.

THE COURT: Johnson. Okay. Yeah. I'm looking at that -- well, I'm looking at page 6 of the probation officer's report, and there was a child mentioned in that. But I gather the altercation that occurred with Ms. Pollard, the child involved was not his own.

MR. HILFIGER: I think there was an issue of the paternity of that child.

THE COURT: Okay.

MR. HILFIGER: But -- and I understand that there was a report made there. However, it looks as if there was nothing filed in that case. Not that I would presume what a prosecutor thinks, but I would assume that they felt there was no need to --

THE COURT: Yeah.

MR. HILFIGER: -- continue to file this case.

THE COURT: It's been a while.

MR. HILFIGER: Yeah. I think that his stability in his relationships, his stability in his work show that he would -- he would appear to court. These are -- he has failures to appear that were a couple of years ago, but I think that he would testify that he does have a stable work environment and he does attend his job regularly.

And he believes that he would be able to keep his job even after being in custody for this certain period of days, which would show that he is now a stable person and he would be able to -- wouldn't have a problem showing up.

With that, I would rest.

THE COURT: So any rebuttal from the government?

MR. HOCH: Just argument, your Honor.

THE COURT: All right. You may argue.

MR. HOCH: As your Honor noted at the outset, this is a rebuttable presumption case, which we would invoke here. I'll first start by addressing the nature and circumstances.

As the Court heard, the Smith DTO has been operating for some time. It's been operating across multiple states. It's at the direction of Marielle Smith.

Admittedly, as Mr. Hilfiger discussed with TFO Spratt, I think it's fair to say that Mr. Willis is not what I would categorize as a leader within this organization. But the reason that the Smith DTO has been able to have success in this area for this many years and effectively transport and distribute all of these controlled substances is because of people like Mr. Willis, lower-level money/drug couriers, more or less serving as a conduit for this illegal activity.

And so I think that's -- although he's not a leader, I do think that the offense conduct is still significant and -- as evidenced by the fact that he's facing a mandatory minimum of

ten years if convicted of this drug conspiracy.

I think the weight of the evidence also supports detention. As the Court heard, we've got three independent sources that have indicated that Mr. Willis is involved in this, that that information has been corroborated and verified based on a review of the -- some of the cell phones that were seized from Mr. Smith during the course of this conspiracy. So I think that also supports detention here.

Mr. Willis' history and characteristics also support detention. As an initial matter, I think it's still a little unclear to me what his release plan would be. You know, I know that there's been some discussion about moving to Lubbock.

That still seems a little bit -- I'm not sure how that would logistically work in terms of -- my understanding is that his license is still suspended, so I don't know what the transport back and forth would look like. I'm not saying he couldn't find someone, but I think that just further complicates it a little bit.

I think there's even some conflicting information in here about -- I think he indicated he could return to that apartment that he's currently at in Oklahoma City in the pretrial services report. I don't know if that's changed. But all that to say I think there's still, to me, a little bit of uncertainty as to where he would go, and I think that

further supports detention in this matter.

I also think his criminal history is concerning. I recognize some of that is juvenile, some of it is minor drug charges, some of it is traffic charges. But I think you add it up and it is something that the Court should take into consideration. There's an eluding police conviction. Again, I recognize it's from a while ago, but I do think it is a factor here.

He's got several failures to appear. He's got the two active -- apparently active warrants from Cotton County.

THE COURT: Where is the eluding?

MR. HOCH: The eluding is -- it's a juvenile eluding.

THE COURT: Okay.

MR. HOCH: It's on -- at the bottom of page 3.

THE COURT: Okay.

MR. HOCH: But that, I believe, is from 2010.

THE COURT: Yeah.

MR. HOCH: So, you know, we can take it for what it's worth. But it is -- it is noteworthy.

Like I said, he has the two active warrants for failures to appear at change of plea hearings and then two other warrants for failures to appear on some miscellaneous traffic offenses.

I think it's also concerning this pending -- I don't know

if you call it pending, but the domestic abuse and assault and battery case that's described. Regardless of whether charges were filed, I'm not quite sure.

We've attempted to reach out to the municipal prosecutor without much luck. I can't speak to how that office is run or what their protocols and processes are, but I do think the PC affidavit -- you know, it does carry some weight here, and that offense conduct is certainly concerning.

So I think, overall, you have a demonstrated pattern of run-ins. You know, we can debate the severity of those run-ins, but, nonetheless, there is a pattern of it.

So I think in light of this, in light of his criminal history, these failures to appear, the offense conduct here that he's charged with, I think detention is supported in this matter.

THE COURT: All right.

Closing argument from the defense, Mr. Hilfiger.

MR. HILFIGER: Your -- first, I believe the presumption has been met based on specifically that he does have a home to go to, that there are two people that would be willing to take him in. That would be his mother and his grandmother. I believe that meets the presumption that he should be detained. And also with his stable work environment, there's more than enough to show that a presumption has been met.

As far as whether or not he should be released, according to the four factors here, I believe that as a whole they weigh in favor of whether or not there are conditions available that would assure his appearance in court and whether or not he's a danger to the public.

I've reviewed all of those conditions. He does agree with them, and I would like to add that there should be one more for him to resolve his pending cases, which would resolve his driver's license issue and he would get his license, which I believe would alleviate a huge concern from the government as to how he's going to get back and forth from either Lubbock or Lawton.

As far as the weight of the evidence, it seems that this information came from confidential sources, confidential informants, all people who, my guess, would never have done what they did had they not been in trouble and tried to save their own skin.

But also, most importantly, he is a minimal participant in this case. He has testified he did not direct anybody. He only received directions. And he acted as he was told. And if he did what he was told from a person such as Mr. Smith, it seems that there's a lot of people that would do what Mr. Smith tells them to do.

The criminal history, they're juveniles. They're juvenile criminal history. He was 14 years old. He was a

child when this -- when most of this stuff happened.

You obviously give what weight you feel is necessary to that, but I don't believe that someone who is 29 years old should be on the hook for something that a 14-year-old did, especially when that 14-year-old -- we don't know what kind of guidance they had as a child, what kind of supervision they had as a child.

But people are vastly different, 15 years, no matter what age gap you're talking about, especially when you're talking about a teenager to an almost 30-year-old man. People have changed and changed dramatically.

So with that, I don't believe that the criminal history of Mr. Willis, at least his juvenile portion as 15 years ago, should be given much credit or much weight as to whether or not he is a danger to society or would fail to appear in these cases -- in this specific case.

As proffered, he has reliable transportation. I do think that it is important for him to get his license back. That would satisfy concerns of the government of whether or not he would show up.

And I know the government also is concerned about his 2022 domestic abuse. They reached out to the prosecutor, as they just said, and didn't find anything. I think that goes to even more weight that the probable cause affidavit shouldn't be given any weight. No charges were filed. No

prosecutor has even talked about this case in two years. It doesn't seem that there is much weight behind anything involved in this case at all.

And it appears that was the -- I believe the only issue of any sort of violence, I believe, since he was a teenager. So I don't see that there is any danger to the public.

Now, if he is in Lubbock, Texas, I think that distances him greatly from anybody involved in this case, which would also protect the public. It appears that there's a search warrant for his phone, so somebody has his phone.

There is no contact that could be made from anybody in the DTO. Obviously, a court order -- part of the conditions prohibiting him from contact with any of the codefendants known and unknown -- I know the unknown part would be hard -- but known and unknown would -- is a condition that could satisfy the Court as future involvement or further involvement in this case.

According to, I believe, the testimony, there was -- I don't know if he talked about how much involvement there was other than there was three people that named him. And all of them, I believe, agreed -- I wouldn't say they agreed, but Mr. Spratt, I believe, would agree that he was a retail- or low-level participant in this case.

Mr. Willis understands the nature and seriousness of this offense. And we haven't gone through the evidence of this

case. And my understanding, it's quite vast. But we don't know how much of that actually pertains to Mr. Willis as being a low-level participant.

But really when we come down to it is whether or not the conditions recommended by probation would satisfy the Court's concern on whether he would show up. And I think that all of these are taken well and he would be -- these -- satisfying these conditions would also satisfy the Court as to whether or not he's going to show up, whether or not he is a danger to society.

And I think these would protect him; specifically being out in a different state away from these people would be a big one for me, but that would be for the Court to decide.

If there is anything that he disagrees with on here -- and he would be willing to do them all and check in for whichever office the Court requires. And we believe these conditions are satisfactory.

THE COURT: All right.

Any rebuttal from the government?

MR. HOCH: No, your Honor.

THE COURT: All right. I'll be back in about five or six minutes.

(A short recess was taken.)

THE COURT: Okay. The first thing I'm supposed to consider in a detention decision is whether Mr. Willis ought

to be released OR; that is, on his own personal recognizance or on a filing of an unsecured appearance bond. I don't think that would be appropriate, so I make that finding.

Next I'm to consider whether Mr. Willis ought to be released subject to additional conditions, and I'm required to impose the least restrictive additional conditions that I believe will reasonably assure his appearance as required and also the safety of any other person in the community.

I've considered the factors found at Title 18 United States Code Section 3142(g). In particular, I've considered the following -- and they're not in any particular order, but they kind of are in this order as far as weight.

I'm not supposed to give them any particular weight based on order, but the first one is the nature and circumstances of the offense charged. You're charged with drug conspiracy. It carries a minimum of ten years, a maximum of life. That's a very serious offense, one for which the rebuttable presumption does apply.

And even if the presumption gets rebutted, then my instructions from the Circuit are pretty clear. I am to use it as yet another factor in making the detention decision just to remind me of what a serious offense you are charged with.

So the offense is drug conspiracy, not a crime of violence or any of the other enumerated crimes. But it does involve a controlled substance. Presumption applies. Was it

rebutted? Yes. I can't just say yes. I have to be -- the case law is developed in such a way that I have to be specific.

So as to dangerousness, I find that the presumption has been rebutted by credible evidence, most of which was imputed in the pretrial report executive summary. There's really not a prior significant criminal record.

From your criminal record you're just not dangerous enough, and that's what -- I realize -- and the government could certainly argue that you're engaged in very dangerous life-altering activity, that being involved in a drug conspiracy.

But when I look at your history, you do have a juvenile history. And, in my opinion, on the juvenile records it's pretty well noted -- it may not have reached Muskogee yet, but I don't show (unintelligible) are different. I think the Supreme Court didn't say it quite that way, but that's -- that's a paraphrase.

Once you turned 18, though, you -- so you've got a rather extensive juvenile record that just doesn't matter a whole lot to me. If there was violent conduct, that does give me pause on occasion. But there's not really anything in your juvenile record that concerns me. As far as your adult record, I don't see any felony convictions. We've got some pending misdemeanor charges.

But, anyway, as to the presumption, I find that the presumption was rebutted as to dangerousness because of the absence of a significant prior criminal record, especially one that is violent in nature.

Was it rebutted as to flight? That's a little harder. I'm going to find that it was rebutted as to risk of nonappearance. You do -- you are proposing a couple of different places to live. We've got Lubbock with your mom. That seems to be the favorite place.

Second choice would be Lawton with your grandmother, although there's some terrible memories from Lawton, albeit not terrible enough to prevent you from maybe transporting 10-kilo quantities of methamphetamine from Lawton to Oklahoma City or Oklahoma City -- excuse me -- Oklahoma City to Lawton. So you at least have got a proposal.

And you do have -- apparently have a good job. You haven't had it for very long. But the way a probation officer explained this to me is you just work a lot of hours. You've got a pretty good hourly rate and you just work a whole lot of hours.

And you've got -- you've got children to support. I hope you're paying your child support. But you seem to have, you know, a good job and a good income work, albeit it we're not sure whether that would transfer to Lubbock or not.

So I find that the presumption was rebutted as to both dangerousness and flight.

Now, I'm supposed to look at the weight -- we're kind of getting more -- we're deeper into the 3142(g) factors. The weight of the evidence against you, I'm going to say it's heavy.

I understand that the sources of this information are, for the most part, confidential informants, but they're all saying about the same thing, that you were a -- you were a courier and that -- is it -- well, CC1 said your role was transporting 10-kilogram quantities of meth back and forth from -- well, from Oklahoma City to Lawton and then cash, I guess, comes from Lawton to Oklahoma City.

CC2 said that you were a courier between Lawton and Oklahoma City, so that's consistent. Plus he added a retail dealer as well.

CS1 had about the same thing to say, that you were a retail-level dealer in Oklahoma City, or multi-kilo-level dealer. Clearly, you're not a leader in the DTO, and that helps.

And I teased the government about the order that the defendants are named in the Indictment. I don't know whether it starts -- certainly, here it started at the top, and I don't know whether culpability is diminished as you move down the chart. You're not the last one. Under that theory, you

would want to be the last person named. You're third from the last, Mr. Willis.

So your proffer was you've got a place to go. You can go to Lawton with your grandmother or Lubbock with your mom. Let me dig a little bit more into -- and let me just get the dangerousness thing out of the way.

The government -- in a drug conspiracy case, the government has always got a good-faith argument when the presumption applies that there's a level of dangerousness to what you do. But I'm not -- you didn't get to clear and convincing evidence of the danger, so I make that finding.

So about all that's left is -- and what we spent most of our time on was the issue of risk of nonappearance. And the burden of proof is lower for the government on that. I just have to be convinced that it's more likely than not -- 51 percent -- am I 51-percent sure that you're going to show up for your future court appearances? Let's get into that.

And I did a lot of misdemeanors. I've done -- most of my life has been filled with misdemeanors. I'm the Lawton misdemeanor guy. So often defense counsel will minimize misdemeanors. Mr. Hilfiger didn't.

But it's just a misdemeanor failure to appear. Well, there are eight of them though. And two of them are pretty fresh. In Cotton County -- I can't -- I don't even know who the judge is there. Maybe it's Taylor Stein.

Judge Stein released you on a $15,000 cash bond. That's a pretty big bond for a DUI in Cotton County. And then you didn't show up on that. They issued a warrant for you based on that conduct. And it's pretty fresh. I think it's 2022.

And then Oklahoma County has got you for two or three arrest warrants for failure to show up on traffic charges there. You've got -- well, you've got an active warrant on a municipal case, bond set at 213. This Oklahoma County -- another Oklahoma County municipal court case where the active warrant bond is set at $500. Two more failure to -- failures to appear on traffic citations, active warrant for failure to appear in Cotton County.

And so, I mean, you're still on bond in Cotton County and then you're catching these charges. Let me see if the conduct -- the conspiracy ran from June of 2022 through September of '24. So -- and you're kind of on bond.

And so when a judge puts you on bond, you pay the money, you deposit it, and you're given a set of rules to follow. It's like follow these rules and things will go well. You know, one big rule is show up, and you didn't.

Another big rule would be don't -- you know, don't engage in criminal activity. And, of course, the government is kind of saying you did by indicting you for federal drug conspiracy.

So that's -- that's kind of what I'm stuck on. And when

I consider -- as the rebuttable presumption circles back, it reminds me that you're facing life in prison. I know the guidelines aren't going to say that. But the rebuttable presumption applies. It's telling me this is a serious offense. You're telling me by your conduct that you're not the kind of guy that shows up or follows court orders.

So despite the fact that your counsel has successfully rebutted the presumption, the presumption sticks around and just reminds me that this is a serious offense for which the government met its burden on risk of nonappearance, and they got to preponderance of the evidence.

So I order you detained pending further court proceedings based on risk of nonappearance.

Anything further from the government?

MR. HOCH: No, your Honor.

THE COURT: Or from the defense?

MR. HILFIGER: No, your Honor.

(Proceedings concluded.)

CERTIFICATE OF OFFICIAL REPORTER

I, Christina L. Clark, Federal Official Realtime Court Reporter, in and for the United States District Court for the Western District of Oklahoma, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the electronically recorded proceedings, transcribed to the best of my ability from said recording of the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 28th day of June, 2026.

s/CHRISTINA L. CLARK
Christina L. Clark, RPR, CRR