IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | Case No. CR-24-436-G |
| | ) | |
| LASASHA JOHNSON, | ) | |
| | ) | |
| Defendant. | ) | |

* * * * * * *

TRANSCRIPT OF

ELECTRONICALLY-RECORDED PROCEEDINGS

HAD ON OCTOBER 18, 2024, AT 11:03 A.M.

BEFORE THE HONORABLE SUZANNE MITCHELL

U.S. MAGISTRATE JUDGE, PRESIDING

* * * * * * *

DETENTION HEARING

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

CHRISTINA L. CLARK, RPR, CRR
United States Court Reporter
200 N.W. Fourth Street, Suite 5419
Oklahoma City, Oklahoma 73102
christina_clark@okwd.uscourts.gov - ph(405)609-5123

## A P P E A R A N C E S

ON BEHALF OF THE GOVERNMENT:

Mr. Stephen C. Hoch
Assistant United States Attorney
U.S. Attorney's Office
210 West Park Avenue
Suite 400
Oklahoma City, Oklahoma 73102

ON BEHALF OF THE DEFENDANT:

Mr. Henry A. Meyer, III
KRAHL GOERKE MEYER & BEHENNA
210 West Park Avenue
Suite 3030
Oklahoma City, Oklahoma 73102

# I N D E X

**PAGE**

EVIDENCE ON BEHALF OF THE GOVERNMENT:

TIMOTHY SPRATT
Direct Examination by Mr. Hoch ...............5
Cross-Examination by Mr. Meyer ...............18

GOVERNMENT RESTS ..................................28

PROFFER BY MR. MEYER ..............................28

CLOSING ARGUMENT BY MR. HOCH ......................30

CLOSING ARGUMENT BY MR. MEYER .....................33

FINAL CLOSING ARGUMENT BY MR. HOCH ................38

RULING OF THE COURT ...............................39

CERTIFICATE OF REPORTER ...........................48

**P R O C E E D I N G S**

(The following proceedings were had October 18, 2024, with Court, counsel, and defendant present:)

THE COURT: I am Judge Suzanne Mitchell, and we are here today on the government's motion for pretrial detention. We had the arraignment in this matter on October 16th.

I'll ask counsel to make their appearances.

MR. HOCH: Good morning, your Honor. Stephen Hoch on behalf of the United States.

MR. MEYER: Your Honor, Hank Meyer on behalf of Lasasha Johnson, who is sitting immediately to my right.

THE COURT: Thank you.

And I have received the pretrial services report. And I'll just confirm the parties have received that as well.

Is that correct?

MR. HOCH: Yes, your Honor.

MR. MEYER: Yes, your Honor.

THE COURT: Okay. And I will ask if the United States would like to present any evidence in support of its motion.

MR. HOCH: Yes, your Honor. The United States, at this time, would call DEA Task Force Officer Timothy Spratt.

THE COURT: Thank you.

Officer Spratt, if you would approach to be sworn in, please.

THE CLERK: Raise your right hand.

(The witness was duly sworn.)

THE CLERK: Thank you. Have a seat, please.

**TIMOTHY SPRATT,**

called as a witness herein, having been first duly sworn, was examined and testified as follows:

**DIRECT EXAMINATION**

BY MR. HOCH

Q Would you please state your name.
A Yes. My name is Timothy Spratt.
Q And how do you spell that?
A T-I-M-O-T-H-Y, S-P-R-A-T-T.
Q Where do you work?
A I currently am employed by the McClain County Sheriff's Office. My current assignment is a TFO with the Drug Enforcement Administration.
Q And how long have you been with DEA?
A Since April of 2023.
Q What type of crimes do you investigate?
A Drug-related crimes.
Q We're here today for a detention hearing for Lasasha Johnson. Are you familiar with Ms. Johnson?
A I am.
Q And are you familiar -- are you familiar with the Smith Drug Trafficking Organization, or DTO?

A I am, yes.
Q Is Ms. Johnson a leader within that organization?
A Yes, she is.
MR. MEYER: Objection, your Honor. This is -- objection.
THE COURT: I understand. I just -- you confused me because I thought you would be sitting over there. Sorry about that. Yes.
MR. MEYER: Objection with respect to this. This is pure speculation. We just had a conspiracy filed under Section 846 21. There's 16 people. And it would be pure speculation on his part.
Just as a matter of record, they've had two years and four months to investigate this. If you look just at the Indictment itself, one of which -- and, in fact, I just got dismissed this week.
With respect to that, we don't have any of the evidence before us --
THE COURT: Can you talk into the mic, Mr. Meyer, just so we can record this? Two years and --
MR. MEYER: Two years and three months to investigate this, if you look at the face of the Indictment, number one.
Number two, I don't have any discovery produced to me in this regard, but I was apprised of that by counsel for the

United States yesterday.

THE COURT: Very well.

MR. MEYER: You know --

THE COURT: Well, I --

MR. MEYER: -- this is pure speculation.

THE COURT: Mr. Hoch, your response.

MR. HOCH: Your Honor, I can strike the question and ask -- I have a number of factual questions to get to regarding Ms. Johnson's role in the conspiracy, so I'm happy to move on.

THE COURT: Why don't we start with that and then you can build up. Thank you.

MR. HOCH: Okay.

Q (By Mr. Hoch) When did law enforcement become familiar with the Smith DTO?

A Law enforcement in general became familiar with the Smith DTO in approximately June of 2022.

Q Can you generally describe the structure of the Smith DTO?

A Yes. The DTO is led and directed by Marielle Smith. And below him were subjects described as trusted members. And then below them would be couriers and retail dealers.

Q And how, primarily, does the Smith DTO operate?

A The Smith DTO primarily operates at the direction of Mr. Smith. Mr. Smith would direct couriers to make trips out

of state to pick up narcotics, bring those narcotics back here, and distribute them to either themselves or other retail dealers.

Mr. Smith would direct trusted members of the DTO, who handled finances and money for them, to collect drug proceeds and provide money to couriers to make those trips.

Q And where was Mr. Smith located during the course of this conspiracy?

A The Oklahoma Department of Corrections.

Q Can you explain how he operated a drug trafficking organization while incarcerated?

A Primarily, through the use of contraband cell phones.

Q And did you have an opportunity to review these contraband phones during the course of your investigation?

A Yes. Several of those phones were seized and forensically downloaded and were analyzed by us.

Q And would it be fair to say that, for the most part, the named codefendants in this matter were not incarcerated during the conspiracy?

A Yes. Most of them were not.

Q And are you aware whether any other coconspirators associated with the Smith DTO have already been charged in this district separate and apart from those named in this Indictment?

A Yes. Numerous codefendants.

Q Okay. I want to ask you, conservatively speaking, approximately how many pounds of methamphetamine has law enforcement determined that the Smith DTO transported?

MR. MEYER: Your Honor, I object to that. I object --

THE COURT: Mic.

MR. MEYER: I object again on the basis that I have -- absolutely none of this information has been provided to me. It would be impossible to even qualify to do an adequate cross-examination. I should have access to that information.

THE COURT: Mr. Hoch, your response.

MR. HOCH: Your Honor, the government is in the process of compiling discovery and we intend to get that to defense counsel as soon as possible, but I don't think that's a valid basis for objecting to the testimony being elicited from TFO Spratt.

THE COURT: I'll allow it for purposes of today's motion. Thank you.

Q (By Mr. Hoch) So I'll ask you again.

Approximately how many pounds of methamphetamine has law enforcement determined the Smith DTO transported?

A In excess of 200 pounds.

Q And approximately how many fentanyl pills has law enforcement determined the Smith DTO to be responsible for?

A In excess of a million fentanyl pills seized.
Q So you're familiar that Ms. Johnson is part of this organization; correct?
A Correct.
Q Do you know how long Ms. Johnson has been involved?
MR. MEYER: Object to the form of the question.
Is the allegation -- is it an allegation that she is a member of a conspiracy? That's what the Indictment stands for under the justice system in this country.
THE COURT: That's what the Indictment is. I understand --
Mr. Hoch, you can respond, and then I'll have my ruling.
MR. HOCH: Your Honor, I think it's -- my question is simply asking about the allegations set forth in the Indictment, the fact that Lasasha Johnson is a named codefendant in this Indictment that's alleging a drug conspiracy.
THE COURT: Very well. And given the relaxed nature of the evidentiary rules that apply during this hearing, and I believe this goes to whether or not the defendant would be a danger to the community, I will allow the question.
Q (By Mr. Hoch) How long has Ms. Johnson been involved with the Smith DTO?
A Evidence obtained by Drug Enforcement Administration throughout this investigation indicates at least back to

mid-2022.
Q And how did law enforcement initially identify Ms. Johnson?
A Initially, through analyzation of those forensic phone downloads with contraband cell phones and through interviews with cooperating defendants.
Q And based on your investigation, can you describe Ms. Johnson's responsibilities within the Smith DTO?
A The evidence and --
MR. MEYER: Your Honor --
THE WITNESS: -- from phone dumps.
MR. MEYER: -- your Honor, just so that we have a record. I understand your ruling and that -- your relaxation.
If you would allow me to have a continuing objection to all of this information that's forthcoming here. This is not a detention hearing, this is basically a preliminary trial that's taking place here to try to show the Court there's probable cause, which we don't have the right to a preliminary hearing pending an Indictment.
THE COURT: I will note that continuing objection, and the Court's ruling will stand with respect to if it goes to whether or not the defendant is a risk of flight or a danger to the community.
You may continue.
Q (By Mr. Hoch) I'll ask again.

Based on your investigation, can you describe Ms. Johnson's responsibilities within the Smith DTO?

A Through the evidence collected, through the forensic downloads of the phones, and through cooperator interviews, Ms. Johnson commonly would receive drug proceeds from retail-level dealers and other members of the DTO.

It was alleged that she would dispense cash to couriers before they would make trips out of state and that, on at least one occasion, she delivered -- or on three separate occasions she delivered narcotics to one other member of the DTO.

Q Are you aware whether members of the Smith DTO ever attempted to clean drug proceeds during the course of this conspiracy?

A Yes. I believe that they would commonly use financial applications, cell phone-based applications, such as Cash App and Chime, to move money from person to person within the DTO, also from customers into the DTO. Specifically, Ms. Johnson's Chime and Cash App accounts throughout the investigation.

We were also made aware that they were -- through cooperator interviews, that they were taking cash proceeds to casinos and putting that cash in slot machines, cashing that back out for tickets for exchanged cash.

Q And are you aware of whether Ms. Johnson ever used a casino for this purpose?

A I'm aware that Ms. Johnson used a casino for -- owned by the Chickasaw Nation for large transactions of money.
Q And how were you able to verify this activity?
A Through administrative subpoenas to the Chickasaw Nation.
Q Okay. Now, you testified that you reviewed several contraband cell phones during the course of this investigation; correct?
A Yes.
Q Did you discover messages in those phones between Mr. Smith and Ms. Johnson?
A Yes. Every one of those phones.
Q Can you just generally describe the nature of those texts -- or those messages?
A For the most part, their conversations would primarily be innocent in nature. But intermixed within those conversations would be discussion about movement of money. Ms. Johnson would provide Cash App accounts or Chime accounts along with other financial means. And then some coded talk that we understand, through cooperator interviews, to -- believe to be talk about narcotics.
Q Are you aware whether Mr. Smith and Ms. Johnson ever had conversations using jail telephones?
A Yes. There was a period of time in early 2024 where DEA was provided recorded jail phone calls from Department of Corrections where there were communications between Mr. Smith

and Ms. Johnson.

Q And can you generally describe the nature of those phone calls?

A Again, the majority of the time in those phone calls were what we would believe to be innocent in nature, but there was also communications between Ms. Johnson and Mr. Smith where Mr. Smith would have Ms. Johnson transcribe messages, what we believe to be text messages going out to other members of the DTO, that discussed drug-related business, financial-related business.

And also Ms. Johnson would facilitate three-way phone calls for Mr. Smith, where she would allow him to talk from the wall phone to someone on the cell phone.

Q Okay. Now, I want to ask you some general questions as it relates to some of these cooperators. I'm going to refer to them as CC1, CC2, et cetera, just to ensure their continued protection.

But I want to first ask you about CC1. What did CC1 say regarding Ms. Johnson's role in this conspiracy?

A CC1 advised that they were employed by Mr. Smith to distribute narcotics, and that on multiple occasions they were directed by Mr. Smith to deliver drug proceeds from the sale of those narcotics to Ms. Johnson directly. And that, on at least three occasions, Ms. Johnson delivered approximately 15 kilos at a time of methamphetamine to them.

Q Okay. Now, I want to ask you about a trip taken by CC2 to Arizona last fall. Can you describe the details of that trip?
A Yes. CC2 was directed by Mr. Smith to drive to Arizona and pick up methamphetamine and fentanyl pills. Prior to that trip, CC2 advised that they were provided money for that trip, both expense money and money to pay for the narcotics, by Ms. Johnson.
Q What did members of the Smith DTO usually drive when making these trips or picking up narcotics?
A It was a pretty common tactic for these couriers to drive rental vehicles. Sometimes rented by the couriers themselves, sometimes Mr. Smith would direct other members of the DTO to rent vehicles for them. And on at least two occasions vehicles rented by Ms. Johnson were taken.
Q Okay. I want to ask you about another trip taken by CC3 wherein CC3 was stopped with 250,000 fentanyl pills in Arizona. Was CC3 working on behalf of the Smith DTO?
A Yeah. CC3 was directed by Mr. Smith to drive to Arizona and pick up those fentanyl pills.
Q After picking up those fentanyl pills, did CC3 agree to assist law enforcement with a controlled delivery of those pills?
A They did.
Q And was that controlled delivery completed?

A It was completed here in Oklahoma City.
Q What car did the person who was being transferred those pills arrive in to that transaction?
A Male codefendant in this case arrived at the meet location in a Malibu -- Chevrolet Malibu registered to Ms. Johnson, received those pills, and drove them back to a residence.
Q When you say, "this case," that was a case separate and apart from this one; correct?
A Correct.
Q Are you aware whether CC3 was indicted in this district for a drug conspiracy?
A They were, yes.
Q And did they continue to cooperate with the government as a federal cooperator after that Indictment?
A They did.
Q What happened to CC3 during the period in which they cooperated with the government?
A CC3 was murdered in the Eastern District of Oklahoma, at the direction -- allegedly at the direction of Mr. Smith, by another codefendant in that alleged Indictment out of the Eastern District.
Q So people have been charged with CC3's murder?
A They have.
Q And one of those people being Marielle Smith?

A Yes.
Q What does the Indictment allege as to Smith regarding CC3's murder?
A That Mr. Smith agreed to pay to have this cooperator murdered and directed the -- another defendant to go to the house and complete that task.
Q And that murder was carried -- allegedly carried out?
A Yes. The cooperator was murdered.
Q And Marielle Smith was incarcerated at the time of this murder; correct?
A Yes.
Q Okay. And, finally, I want to ask you about Ms. Johnson's arrest on October 16, 2024.
Did law enforcement serve a search warrant on the day of her arrest?
A Yes. A federal search warrant was served at her residence.
Q What was recovered from her residence?
A Approximately a kilogram of methamphetamine, a little over 300 grams of marijuana, and a firearm.
Q Were any cell phones recovered?
A Yes. Numerous cell phones were recovered from the residence.
Q And how do you know it was methamphetamine?
A It was field tested by agents prior to processing.

MR. HOCH: I'll pass the witness, your Honor.

**CROSS-EXAMINATION**

BY MR. MEYER

Q Is it Agent Spratt or --

A It's Task Force Officer Spratt, sir.

Q Okay, sir. With respect to -- Ms. Johnson's never been indicted on this alleged murder in the Eastern District, has she?

A No, sir.

Q In fact, is Mr. Smith serving a life sentence without parole in McAlester for a state murder charge?

A He is serving a sentence, but he's currently in federal custody.

Q And that -- but, at any rate, just to answer, he does have -- he's serving a life sentence. And he may now be in federal custody --

A Yes.

Q -- but he's serving a life sentence without parole for a murder that he -- took place way before this other allegation that you said he's charged with in the Eastern District; correct?

A Correct.

Q Correct?

A Correct.

Q And Ms. Johnson is not charged in having any implication

in that murder that took place, is she?
A She is not.
Q Now, with respect to C1, C2, or C3, did all of those individuals -- were they represented by counsel when they gave Rule 11s in cooperation with the United States of America?
A If they -- if the information was received in Rule 11s, they were. Some of those interviews were done post-*Miranda* prior to court proceedings.
Q Well, let's clarify. Did each one of those people -- C1, C2, C3 -- give, after the post-*Miranda*, Rule 11 interviews with the United States of America?
A I believe so, yes.
Q Now, you mentioned a field test that took place.
A Yes.
Q And that -- a field test is where you -- do you think those are reliable?
A Generally reliable, yes.
Q When you say general, don't they have about a 48-percent chance of failure?
A Not to my knowledge. But, again, that's not my area of expertise.
Q Okay. So you wouldn't know whether it was correct or not if I said 48 percent?
A They were field-tested within DEA policy and --
Q Are you aware that you can't use a field test even in a

probable cause hearing?
A I am not.
Q That it has to be subject to a certified inspection for drugs?
A They were field-tested within DEA policy and will be shipped to the drug enforcement administrative lab in Dallas for testing.
Q And you don't have that report back yet, do you?
A No. It's been two days, sir.
Q Well, my question is: You don't have that report back?
A It's been two days. No, I do not.
Q The case I just mentioned earlier was dismissed -- the Indictment -- for failure of a field test.
A Okay.
Q Okay. And in addition to that --
MR. HOCH: Your Honor, I'm unaware of an Indictment being dismissed because of a field test. I'd ask for clarification on what case that was and --
MR. MEYER: It was before Judge Heaton, over three counts, Counts 1, 2, and 3. And my client was in Counts 2 and 3. And yesterday there were two orders issued, No. 46 and 45, and the cases -- the counts were dismissed against my client. And I'll be happy to provide later, after this, copies of the dismissal and order --
THE COURT: We understand that. Just that you

haven't referred to a specific case previously. So thank you. But it's not related --

MR. MEYER: Yes. My client's name was Esmeralda Henson, H-E-N-S-O-N.

THE COURT: Thank you.

Q (By Mr. Meyer) Now, with respect to Ms. Johnson, do you know whether or not she's originally from Lawton, Oklahoma?

A I do, yes.

Q And what is the answer to that? Is she?

A She is, yes.

Q Did she graduate from Eisenhower High School there in Lawton, Oklahoma?

A I do not know that portion of her history, no.

Q Is her mother alive?

A I believe so.

Q Does she have any brothers and sisters?

A Yes. Not sure the count, but I know she does have siblings.

Q Okay. So you wouldn't know whether she had two brothers and three sisters or not?

A No.

Q And they all were raised in Lawton, Oklahoma, Comanche County?

A If you say so, sir.

Q Okay. And how far -- when you did the search that day,

was that in Wichita Falls?
A Correct.
Q That's about a 40-minute trip, isn't it, from Lawton, Oklahoma, to Wichita Falls?
A Yeah. Approximately.
Q And it's in the close vicinity. So she lives -- she has substantial -- if she's 26 years of age, for 26 years she's lived in that community, has she not?
A To the best of my knowledge, she's -- the only two places that I know she's lived is Wichita Falls and Lawton, yes.
Q How long has she lived in Wichita Falls? About a year?
A Approximately, that we know of, yes.
Q Okay. And prior to that time she lived in Lawton, Oklahoma?
A Yes. And I need to correct my earlier statement. She, at one point, lived in Oklahoma City.
Q Her father lives in Oklahoma City, does he not?
A I'm unsure of that.
Q Huh?
A I'm unsure of who her family is that lives up here, but I know that she, at one point, had a residence here.
Q You've certainly had a look at her criminal history, haven't you?
A Or lack thereof, yes.
Q And there is -- when you mention a "lack thereof,"

there's a total lack of criminal history with her, is there not?
A Yes, sir.
Q You mentioned as well in here that she certainly -- when you served the -- you didn't have any kind of problems when you served the search warrant on her two days ago, did you?
A None were documented, no. I was not present at that search warrant.
Q When you say, "none were documented," you talked to the United States Probation Office, didn't you?
A Yeah.
Q Didn't you see what they wrote in here?
A They were advised that she did not resist arrest or fight at the time of arrest, no.
Q And she doesn't have drug use. Have you seen this report?
A I have not.
Q And then are you aware of any -- did you check out any of her bank accounts?
A Not to date, no.
Q Huh?
A Not any legitimate bank accounts, no.
Q You don't even know if she has any, do you?
A No. I believe that there was documentation collected at the search warrant that indicated that she does.

Q Now, recently within the Western District of Oklahoma -- are you familiar with the Indictment? Are you familiar with the Indictment?
A On this case, yes.
Q Yes. Huh?
A Yes.
Q On paragraph -- Ms. Batise and Goldsby were stopped in Arizona with 1,900 kilograms of fentanyl and a loaded firearm; correct?
A Correct.
Q That's the allegation there. Were they -- is this the Indictment that they -- or were they ever -- was this ever superseded in a prior Indictment?
MR. HOCH: Your Honor, I'm not sure TFO Spratt is capable of answering that question. It's broad in terms of --
THE COURT: Well, I'll just --
MR. HOCH: -- talking about --
THE COURT: -- I'll just let him answer. If he can't answer it, he can't answer it.
THE WITNESS: I would ask for clarification. Are you asking if they were previously charged --
Q (By Mr. Meyer) Yes, sir.
A -- in another area?
Q Yes, sir.
A Yes. They were charged in Gila County, Arizona, on state

charges.
Q Gila?
A Gila County, Arizona.
Q Help me out. I'm hard of hearing. G-I-L-A?
A Yeah. It's outside Phoenix.
Q Okay. Now, if you look at paragraph 4 of the Indictment, was -- Amber Earp picked up approximately $140,000 of drug proceeds from Lanadia Lewis?
Are you aware of those facts?
A Yes.
Q Now, Ms. Johnson wasn't involved in that, was she?
A No. There were several members of the DTO handling cash.
Q Okay. And is Ms. Earp, is she being released, do you know, on bond?
A Ms. Earp is currently incarcerated by the Department of Corrections. She was brought here on a writ.
Q Oh. Writ of prosecution?
A Yeah.
Q On May 20, 2024, Olivia McIver and Audrey Lassiter were stopped in California with more than 17 kilograms of meth and nearly 5,000. Was Ms. Johnson with them at that time?
A No.
Q With respect to February 16, 2024, Amanda LaFebre -- maybe I mispronounced that -- and Bridgette Hudgens were stopped in Oklahoma with approximately 37 kilograms of meth

and a firearm. Are you aware of that?
A Yes, sir.
Q Was Ms. Johnson with them?
A No. Ms. Johnson was not present for any of the other defendants' arrests.
Q So she wasn't involved with them?
A There's -- no, not in -- with those individuals.
Q Are you aware of the provisions -- so she has strong community ties; correct?
A I'm unsure of her --
Q Well, strong community --
A -- social status, sir.
Q -- ties, if you were 26 years of age and you lived 25 of those years in Lawton, Oklahoma, and you moved 40 minutes away, wouldn't you feel confident saying there are strong community ties of my client, Ms. Johnson, to the Lawton area?
A I'm comfortable with telling you I believe she has strong family ties in Lawton. I would -- I would be speaking out of turn to speak of her social ties.
Q And the defendant's criminal history is basically nonexistent --
A Correct.
Q -- correct?
She is 26 years of age; correct?
A I believe so, yes.

Q And you don't know about her educational attainment at this point, do you?
A I do not.
Q She doesn't -- she rents her home in Wichita Falls, does she not?
A I do believe it's registered to a separate owner, which would indicate it's a rental property.
Q And that you've looked on -- criminally speaking, you've looked for substance abuse problems with her and there's none on her record?
A I have not looked at substance abuse problems for any of these defendants.
Q Okay. Did you look for criminal records of these defendants?
A I did look at criminal --
Q There is --
A -- records.
Q -- no criminal record of Ms. Johnson as it relates to substance abuse problems, is there?
A Not in her criminal history, no.
Q And she's a citizen of the United States, is she not?
A Yes.
MR. MEYER: I don't have any other questions at this time, your Honor.
THE COURT: Thank you.

Any redirect?

MR. HOCH: No, your Honor.

THE COURT: Thank you.

Officer Spratt, you are excused.

Would the United States like to present any other evidence in support of its motion?

MR. HOCH: No, your Honor.

THE COURT: I'll ask, Mr. Meyer, would you like to present any evidence via testimony and/or proffer?

MR. MEYER: I would like to present a proffer at this moment, your Honor, before I make final argument, in that I think I've succinctly laid out the fact that my client was born in Lawton, Oklahoma --

THE COURT: Could you be at the podium and --

MR. MEYER: Yes. I'm sorry.

THE COURT: Thank you. And to the extent that it doesn't duplicate some of the testimony that you've -- were able to extract, but ...

MR. MEYER: My client was born in Lawton, Oklahoma. Her mother is alive and lives in Lawton, Oklahoma. One of the places that my client -- and the mother told the United States Probation Office that if there was a problem with her living in Wichita Falls, Texas, that she could come and live at her house. She has two brothers and three sisters. One sister does live in Arizona, your Honor. Her father, Mr. Johnson,

lives in Oklahoma City, Oklahoma.

If you look at the criminal history record, I think at most there might be one point -- maybe one point in that entire thing.

If you look at the facts of her education, I mean, there's no question that she has close community ties to Comanche County, specifically Lawton, Oklahoma, where she graduated from high school.

She's presently working for DoorDash in Wichita Falls, Texas. She has daily contact with her mother and weekly contact with her father as well as with her brothers and sisters.

She also has 15 dogs. She's trying to acquire a kennel license so that she can board animals and take care of dogs in there that was bought out.

With respect to the other factors in here, the -- her age is beneficial to her. Her educational -- she has graduated from high school, being Eisenhower High School in Lawton, Oklahoma.

She doesn't have residential ownership, but she certainly has leased property where she -- where the search took place in Wichita Falls. And we know of two days ago that she was amenable, she was a human being, she would be like anybody in this courtroom when served with a search warrant, was compatible with them.

The -- does not have substance abuse problems. Says that she drinks occasionally, alcohol, and that she was using marijuana about three times a week; and that her citizenship is in the United States of America.

I'll reserve most of my other comments for later, but the government's failed in its proposition and its burden to go ahead and prove that this is -- my client is dangerous to society in this instance. And the record is impeccably in her favor on this. There is no question about that.

THE COURT: And we'll hear you in argument next --

MR. MEYER: Yes.

THE COURT: -- after Mr. Hoch proceeds.

When you're ready, Mr. Hoch.

MR. HOCH: Your Honor, I'd first invoke the rebuttable presumption here. This is an Indictment charging Ms. Johnson with a penalty carrying ten or more years in prison under the Controlled Substances Act, so I would invoke that rebuttable presumption here.

As the Court's aware, 10 of the 16 defendants were seen -- or were arraigned as part of this conspiracy on Wednesday. Aside from those already incarcerated, the government is seeking detention on two of those defendants. One of those defendants is Ms. Johnson. And I think that speaks to Ms. Johnson's role within this overall conspiracy.

Many of these other coconspirators, to generally classify

them, are couriers, more or less; lower-level, less-trusted associates. Ms. Johnson, she's occupied a position of trust within this DTO as evidenced by some of her activities over the course of the better part of two years -- or two or more years.

And, basically, as long as this investigation has been going on, law enforcement has time and time and time again identified Ms. Johnson as a highly trusted member. And unlike many of these other codefendants at the time of their arrest on Wednesday, Ms. Johnson was still actively involved in the Smith DTO.

And we know that because she had a kilogram of meth in her house, she had several cell phones, she had a firearm. So her involvement in this starts at the beginning and ends at the day of her arrest; whereas, many of these other codefendants, they do not. And that speaks to her position within the overall DTO.

Now, her criminal history is limited. There's very little there. But, again, this argument is based on her position as a trusted associate within the Smith DTO. And as the Court heard during the course of this conspiracy, Mr. Smith was using contraband cell phones to direct trusted associates -- namely, Ms. Johnson -- to do his bidding.

For more than two years she complied with that. She did his bidding. She served as a conduit for illegal activity.

Now, she wasn't maybe taking the trips herself. She wasn't arrested in Arizona or California with some of these other people. But, again, I think that speaks to her position. She's directing these people. She's providing them money for these trips.

And as the Court also heard, not only was Mr. Smith using contraband cell phones to run this drug trafficking organization, distribute, acquire significant amount of drugs and money, he also directed the murder of a federal -- excuse me -- allegedly directed the murder of a federal cooperator while incarcerated. He's under Indictment for that.

And I'm not sitting here today in any way saying that Ms. Johnson had anything to do with that murder. However, I am saying that this is a very dangerous organization. It's led by Mr. Smith, and Ms. Johnson is a trusted associate of Mr. Smith.

By being out, again, I don't think that it's an argument that she's going to flee or not appear, but I think the argument is that she can continue to do his bidding. Again, most of what she has been doing has been through facilitation. And I think the conditions that are being proposed that she would be under, she could still do that bidding.

She can do these things surreptitiously through the use of a cell phone, through the use of multiple cell phones. So I think that is what's most concerning to the government.

I recognize that Mr. Smith is now in federal custody, but he's proven, obviously, that he has a knack for acquiring these contraband cell phones. So I don't think -- I wouldn't put it past him to acquire another cell phone while incarcerated.

I think the weight of the evidence also supports her detention. As you heard, we have several cooperators that have implicated Ms. Johnson, the review of these cell phones, the fact that she had methamphetamine, cell phones, a firearm in her home on the day she was arrested.

I think just at the bottom -- at the bottom line, this is an extremely dangerous organization, and Ms. Johnson has been a leader in that organization. She's been at its highest levels for multiple years until the moment she was arrested. And for those reasons, we would ask that she be detained.

THE COURT: Thank you.

Mr. Meyer, when you're ready.

MR. MEYER: Your Honor, just to address a couple of points in here. First, I'm sure you're aware of the *Salerno* opinion. I'm not going to pull the Georgetown Law Journal article on Bail Bond Reform Act. The government's argument fails dramatically.

There is one leader of this organization -- and it should be apparent to everybody in this courtroom -- and that is Mr. Smith. He is the leader. My client, Ms. Johnson, is not

a leader. And that every person that was involved in this took directions that emanated from Mr. Smith.

It was admitted to you by the United States that she is not a risk of flight a few minutes ago. But I kind of think -- let's take a look at what PTRA does. And that with respect to PTRA, let's kind of go over a couple of points in here.

And I'm going to give aids to the Court here -- to you and to the United States of America. And I'll go through those in a second.

This is what I framed -- there is a Table II, and it is PTRA failure rates for any adverse events involving new criminal arrests, pretrial revocations, or failure to appear.

And if I'm allowed, I will give a copy to the United States. And I put this -- she's No. 3, your Honor --

THE COURT: Right.

MR. MEYER: -- on the first page.

THE COURT: Yes. I've got that table. Uh-huh. Thank you.

MR. MEYER: So I would point out that the pretrial report itself on the front page --

THE COURT: Uh-huh.

MR. MEYER: -- lists the PTRA score; the failure to appear at 5 percent; the new criminal arrest, 5 percent; revoke for technical violations, 10 percent; a total failure

rate of 19 percent.

But if you just look at the front page, before you go to this sample argument that I've created on the risk category, you can see that the failure rate -- that means the failure rate to appear, there would be a 95-percent assurance that she would appear --

THE COURT: Right.

MR. MEYER: -- on a new criminal arrest. It would be 95 percent that she wouldn't have a new criminal arrest. But it's -- basically, the pretrial services report could read the defendant has a PTRA risk category of 3.

The defendant's PTRA risk category is 3, indicating an 81-percent likelihood of overall success and a 90-percent likelihood of success when not considering technical violations. That's from the first page.

As well as giving you that information, the BRA requires your Honor to release Ms. Johnson as long as there are conditions of release that will reasonably assure two things: her appearance in court and the safety of the community.

The legal standard is in Section 3142(e)(1):

"If after a hearing, pursuant to the provisions of Subsection F of this section, the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer

shall order detention of the person before trial."

That hasn't been met.

As one Court of Appeals has recently held:

"The pretrial detention decision must be based on an individualized assessment of the risk that this particular person poses to the community in the future, not simply the riskiness of her alleged offenses."

That's what you've heard -- and that is from the United States v. Lewis, 2023 Westlaw 4351244 at *1 (7th Circuit July 5, 2023.)

Ms. Johnson's PTRA score gives your Honor an evidence-based way of assessing the future risk.

As the administrative office has explained:

"While reasonable assurance can be a somewhat elastic concept, the PTRA can be used to empirically assess the odds of pretrial failure and assist judicial officers/officials in making release decisions based on the evidence and data."

And that is found in Cohen, Lowenkamp, Hicks, *Revalidating the Federal Pretrial Risk Assessment Instrument (PTRA), A Research Summary*, of 2018, and that is where -- that's the source, by the way, for the sample argument that I've given to you.

In this case, Ms. Johnson's PTRA score provides your Honor with way more than a reasonable assurance demanded by the statute. Her PTRA score establishes that it is highly

likely someone like her will appear in court and will not be rearrested for anything.

According -- you will now look at the sample argument I gave you, and I'm quoting to the PTRA. If you release Ms. Johnson, there is a 97.5-percent chance she will appear for court.

Secondly, there is a 98.7-percent chance that she will not be rearrested for a violent offense.

There is a 91.5-percent chance that she will not be arrested for any violations, which I believe clearly establishes that you're dealing -- that the facts in this case are clearly on my side.

Looking at it another way, the odds of -- are, I believe, eight to -- I think it's eight to one, your Honor, that someone in Ms. Johnson's PTRA category will show up for court and will not be rearrested.

And I wish for tomorrow's game that the University of Oklahoma had an eight-to-one chance, which --

THE COURT: I understand that. I don't like to engage in such gaming or speculation, but I understand your argument put forth --

MR. MEYER: Okay.

THE COURT: -- as to the PTRA.

MR. MEYER: Okay. And then any lingering concerns that you may have about Ms. Johnson can be addressed by

conditions of release.

As one Court of Appeals has recently held, "dangerousness alone is an insufficient basis for pretrial detention, for if that danger can be reasonably mitigated by release conditions, then pretrial release is required."

And that is Lewis 2023 Westlaw 4351244, that I cited to you earlier, at paragraph 2.

Ms. Johnson's high likelihood of success on bond and the other 3142(g) factors all demonstrate that release conditions we have proposed or have been proposed by probation are reasonable -- that reasonably mitigate any concerns that anyone would have.

Because the government has not carried its high burden under the statute, we ask your Honor to release Mrs. Johnson -- Ms. Johnson. I'm sorry, your Honor.

THE COURT: Thank you.

And the government has the last word in this.

Anything further?

MR. HOCH: Very briefly, your Honor.

THE COURT: You may when you are ready.

MR. HOCH: Your Honor, I would just note that the bulk of counsel's argument was focused on the PTRA score. And in some instances the pretrial services report is really all we have, but in this instance there -- in my view, there's been quite a bit more context that's been added that the PTRA

score just cannot account for and does not account for.

So I think that that undermines any argument that she should be released based on a number -- based on a mathematical calculation. And so, again, I think that detention is supported in this matter.

THE COURT: Thank you. The Court will take a brief recess before issuing its decision.

(A short recess was taken.)

THE COURT: So, first, the Court will note that any findings it makes during this hearing only bear upon whether or not the defendant is detained or released pending trial. It has no bearing upon the defendant's presumption of innocence as to the underlying charge.

I'm just pulling up my notes here.

So as the United States pointed out, this is what is called a rebuttable presumption case given the nature of the charge and the potential sentence that it bears with it. There is a presumption that the Court must detain the defendant because it could not come up with any set of circumstances to reasonably assure the safety of the community and reasonably assure the defendant's appearance in court.

However, the defendant can present some evidence, as has been outlined in case law, to overcome -- to rebut that presumption. And the Court does find that the pretrial services report, in conjunction with the defendant's criminal

history, do satisfy that "some evidence" threshold. However, that presumption is something that the Court has to keep in mind when making its decision.

So having found that the presumption has been rebutted, the Court turns to the factors under the Bail Reform Act that it must consider, and those include the nature and circumstances of the offense charged and including whether or not it is one that involves a controlled substance.

And, as evidenced by the Indictment and evidenced by the testimony provided here, it certainly is one that does involve significant amounts of controlled substances, especially those that are particularly dangerous, including fentanyl.

The weight of the evidence against the person. The Court notes that there has been an Indictment returned by the grand jury and that some additional evidence was presented today that the Court finds credible. So the weight of the evidence against the person also weighs against release.

But turning to the history and characteristics of the person, the Court would note, as has been explained, that the defendant is a lifelong resident of Oklahoma, having lived in Lawton and Wichita Falls, which is just over the border, so almost a lifelong resident, and for perhaps a small time in Oklahoma City. She has not traveled outside of the United States. She has significant family ties in the Lawton/Wichita Falls area. She received a high school diploma in Lawton,

Oklahoma.

And other aspects you would look to -- the Court would look to would be her criminal history, which is negligible, as even conceded by the United States, and mostly juvenile based. The -- so the past conduct is not one of concern.

History related to drug or alcohol abuse, as noted by defense counsel, seems to be minimal and such that could be mitigated by conditions. And the record concerning appearance in court proceedings, the Court does not appear to have any issues with failures to appear except for one that appear to relate to a failure to pay, which does not give the Court great concern given the nature of many of those -- those type of warrants.

And then whether or not the defendant was on parole or probation at the time of the arrest, and that is not the case. And as also evidenced in the testimony today, the defendant did not pose a threat when she was -- or resist arrest.

She did have a firearm and significant number of cell phones and there was a significant amount of supposed and probable contraband that was found at her residence. But that, again, could also be mitigated by certain conditions of release.

And then the nature and seriousness of the danger to any person or the community that would be posed by the person's release. The Court did hear significant argument and evidence

presented as to this, but the Court's role is to determine whether it can impose circumstances that would, again, reasonably assure the safety of the community. And the Court does believe that it can impose such conditions. There will be additional to those that are presented by the pretrial services office.

So I'll ask if, Ms. Johnson, you and Mr. Meyer would please approach the podium. And I'm going to review with you now the conditions of your pretrial release.

I'll also -- before I review those, I'm going to ask that you have an opportunity to have your writing hand free so that you can initial and sign the relevant paperwork.

But I'm going to ask that you pay close attention to these -- Mr. Meyer will go over these with you as well -- because I can assure you that if there is a violation, you will be back in this court and that you would face some serious consequences with respect to that.

You will -- beginning with the standard conditions, you must not violate any federal, state, or local law while on release. You must cooperate in the collection of a DNA sample if it is authorized by statute.

You must advise the Court -- the pretrial services office in writing before you make any change of residence or phone number. You must appear in court as required, and you must sign a $5,000 unsecured appearance bond.

You will submit to supervision in the Northern District of Texas, and that phone number will be given to you today. And you can confer with Mr. Meyer about arranging a time. But you must talk to them no later than noon on Monday.

MR. MEYER: Your --

THE COURT: You must -- yes, Mr. Meyer?

MR. MEYER: Your Honor, I would really be grateful if we could get delayed until Monday and so that we could change that to Tuesday at noon.

THE COURT: Because you can't be there or facilitate that or ...

MR. MEYER: I can be here Monday, but -- I can get her today. Fine.

THE COURT: I think that that contact can be a phone call and then they can arrange a time for her to meet in person.

Is that correct?

PROBATION OFFICER: That's correct, your Honor.

THE COURT: I mean, I'd rather not have her there over the weekend if we could avoid that.

MR. MEYER: Very good, your Honor.

THE COURT: Okay. You must -- this is going to be a key one. You must continue to be employed or actively seek employment. And that means -- and this will be shared with the Northern District of Texas -- there must be verifiable

employment.

There seems to be a slight contradiction between DoorDash and what Officer Spratt believes is taking place. So you will have to show screenshots to show that you are actually delivering DoorDash deliveries.

THE DEFENDANT: Okay.

THE COURT: And if there is an issue with that, I can assure you we can escalate these conditions so that we can have some GPS monitoring to make sure you're going where you're supposed to be going.

Do you understand that?

THE DEFENDANT: Yes, ma'am.

THE COURT: Okay. You must -- your travel will be restricted to the Northern District of Texas and to this district, the Western District of Oklahoma, which is for court purposes only unless preapproved by the pretrial services office.

So I anticipate you might be visiting your mother, but you need to just get that all cleared with the Northern District of Texas when you're leaving that district.

THE DEFENDANT: So I can visit?

THE COURT: My guess is they're going to allow it, but let's get it all cleared so there's no confusion. So any time you're going to be leaving that Northern District. Otherwise, if you're coming here for court purposes, you can

certainly talk to Mr. Meyer, and that would be prearranged.

Now, this is where I'm going to need the assistance of the United States. I'm imposing condition G, to avoid all contact directly or indirectly with any person who is or may be a victim or witness in the investigation or prosecution.

And, from my perspective, obviously, that includes -- and I'll add this -- all codefendants listed in the Indictment.

Is there anyone else that you would like to add to that?

MR. HOCH: Your Honor, we would add one additional person. That would Martavion Johnson.

THE COURT: Can you spell that for us just so we can -- M-A-R- --

MR. HOCH: M-A-R-T-A-V-I-O-N.

THE COURT: Martavion Johnson.

MR. HOCH: That's --

THE COURT: Is that a relative of the defendant?

MR. HOCH: That's Ms. Johnson's brother. He is in federal custody on a --

MR. MEYER: M-A-R what? I'm sorry.

THE COURT: M-A-R-T-A-R --

MR. HOCH: Sorry. M-A-R-T-A-V-I-O-N.

MR. MEYER: V-I-O-N. Okay.

THE COURT: So, ma'am, do you understand that everyone who is listed here in this Indictment, including your brother -- and also your brother, Martavion Johnson, you

cannot have any contact with directly or indirectly?

And Mr. Meyer will talk to you about this. That means no phone calls, no text messages, no messages via other routes. And this is -- I know it's a difficult one, but this is really important. And this is one that the evidence that was presented certainly gave the Court great pause. And, again, any violation of that and I will review with you the consequences you will likely face.

You must not possess a firearm, destructive device, or any other weapon while on pretrial release. You must not use alcohol excessively. You must not use or unlawfully possess a narcotic drug or any other controlled substance.

MR. MEYER: That includes marijuana.

THE COURT: Right.

MR. MEYER: It's a federal offense.

THE COURT: Right. So unless it's been prescribed by a licensed medical practitioner. And there is no exception for medical marijuana. There's no exception there for that. And you will submit to testing for such prohibited substances if required.

You must report as soon as possible any interaction you have -- to the pretrial services office or supervising officer any interaction with law enforcement, be it in the form of an arrest, a questioning, or a stop.

And you must contribute to the cost of treatment services

that are provided, and that would be in a copayment amount to be determined by the pretrial services office.

And, again -- so I'm particularly concerned about the contact. So that means any kind of Facebook messaging, any kind of thing like that. If the United States -- and they're pretty good about figuring this out. That would cause great problems.

So violation of any of these conditions may result in the immediate issuance of a warrant for your arrest, a revocation of your release, an order of detention, a forfeiture of your bond, and a possible prosecution for contempt of court.

Do you understand these conditions, ma'am?

THE DEFENDANT: Yes, ma'am.

THE COURT: And do you understand the consequences you will likely face should you violate these?

THE DEFENDANT: Yes, ma'am.

THE COURT: Very well.

Is there anything further from the United States in this matter?

MR. HOCH: No, your Honor.

THE COURT: Anything further, Mr. Meyer?

MR. MEYER: Can I make an inquiry here and then ask a question maybe to --

THE COURT: Yes.

(A discussion was held off the record.)

MR. MEYER: We've got it covered.

THE COURT: Thank you. So nothing further, Mr. Meyer?

MR. MEYER: No, your Honor.

THE COURT: Thank you. Parties are excused.

And, again, I'll ask if you have a seat, Mr. Meyer, with your client so that she can sign the relevant paperwork. We'll be on our way. Thank you.

(Proceedings concluded.)

CERTIFICATE OF OFFICIAL REPORTER

I, Christina L. Clark, Federal Official Realtime Court Reporter, in and for the United States District Court for the Western District of Oklahoma, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the electronically recorded proceedings, transcribed to the best of my ability from said recording of the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 30th day of June, 2026.

s/CHRISTINA L. CLARK
Christina L. Clark, RPR, CRR