IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF OKLAHOMA
OKLAHOMA CITY DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MARIELLE SMITH | CRIMINAL ACTION NO.<br><br>5:24-CR-436-G-1 |

**Motion for Attorney-Conducted Voir Dire**

Comes now, Defendant, Marielle Smith, by and through undersigned counsel, and requests that this Court allow the attorneys to voir dire the venire before striking the jury to effectively and efficiently provide counsel and the Court with sufficient information to exercise cause and peremptory challenges. Further, attorney-conducted voir dire minimizes the risk of implicit bias. In support thereof, he shows as follows:

## I. Introduction

Mr. Smith was charged in a multi-defendant indictment, charging him and others with conspiracy to possess with the intent to distribute controlled substances, including 400 grams or more of a mixture or substance containing a detectable amount of N-phenyl-N-[1-(2-

phenylethyl)-4-piperidinyl] propanamide (fentanyl), a Schedule II controlled substance, 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, and salts of its isomers, a Schedule II controlled substance, and five kilograms or more of a mixture or substance containing a detectable amount of cocaine, its salts, optical and geometric isomers, and salts of isomers, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(l). (Doc. 1). After all, but one co-defendant reached a resolution to the charges, the government returned a superseding indictment against Mr. Smith with the same charge. (Doc. 683). He has entered a not guilty plea. (Doc. 700).

Marielle Smith is a 33-year-old black man, who is charged with operating a drug-trafficking organization (DTO) out of Oklahoma state prison. Furthermore, the government alleges that he had others working on the street for him, including other black males and females, and at least one white female. Marielle Smith is an African American male, who has many tattoos, and his hair is fashioned in a style called “locs” or “dreadlocks.”[1]

[1] Dreadlocks is an ethnic hairstyle popular among people of African descent, achieved by washing and twisting strands of hair into

In light of these issues as well as the abundance of research documenting the existence of implicit race bias, it only makes sense to acknowledge Mr. Smith's race and some of the implicit biases that may present in this case.

Mr. Smith requests that the Court permit each side in the case a reasonable period of attorney-conducted voir dire, not as a substitute for court-conducted voir dire, but as a complement and addition to the Court's voir dire. Supplemental attorney-conducted voir dire will most effectively advance the goal of obtaining an impartial jury through (1) the intelligent exercise of peremptory challenges by counsel, and (2) full and informed consideration by the Court of any challenges for cause which may be made.

The Sixth Amendment provides:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, *by an impartial jury* of the State and district wherein the crime shall have been committed, which

---

permanently tangled braids that are uncombed. *See* Dreadlocks," Wikipedia, The Free Encyclopedia, available at https://en.wikipedia.org/wiki/Dreadlocks#cite_note-21 (last visited June 3, 2017). The English Oxford dictionary defines "dreadlocks" as "[a] Rastafarian hairstyle in which the hair is washed but not combed and twisted while wet into tight braids or ringlets hanging down on all sides." *See* English Oxford Living Dictionary, Available at https://en.oxforddictionaries.com/definition/dreadlocks.

> district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.

U.S. Const. amend. VI (emphasis added).

Jury impartiality is a core requirement of the right to trial by jury guaranteed by the U.S. Constitution. *See Morgan v. Illinois*, 504 U.S. 719, 727 (1992) ("In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process."(internal citations omitted)).

An impartial jury is one that has not formed an opinion prior to hearing and assessing all of the evidence, and one that bases its decision only on the assessment of the evidence not on pre-formed conclusions and biases. *See Morgan*, 504 U.S. at 727.

## II. Attorney-conducted voir dire is critical in this case

The Sixth and Fourteenth Amendments guarantee the constitutional right to a trial by an impartial jury and the selection process to create that impartial jury is critical. "Fundamental to our justice system—and even our democracy—is the jury." *United States v. Murry*, 31 F.4th 1274, 1281 (10th

Cir. 2022). Voir dire of potential jurors plays a critical function in ensuring a defendant's Sixth Amendment right to an impartial jury is honored. *Swain v. Alabama*, 380 U.S. 202, 218–220 (1965) (overruled on other grounds by, *Batson v. Kentucky*, 476 U.S. 79 (1986)); *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981); U.S. Const. amend. VI. Absent adequate voir dire, the trial judge cannot fulfill his responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence. *Id.* A sufficiently probing voir dire is critical for the Court to meets its "responsibility to remove prospective jurors who will not be able to impartially follow the court's instructions and evaluate the evidence." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981). A thorough voir dire process is also necessary to allow the accused to exercise peremptory challenges meaningfully. *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981). To ensure that those who enter are purged of prejudice, both challenges for cause and the full complement of peremptory challenges are crucial. *J.E.B. v. Ala ex. Rel T.B.*, 511 U.S. 127, 143-44 (1994) ("*Voir dire* provides a means of discovering actual or implied bias and a firmer basis upon which the parties may exercise their peremptory challenges intelligently.").

Rule 24(a) of the Federal Rules of Criminal Procedure grants the Court broad discretion in conducting the voir dire examination. The rule specifically provides: “The court may examine prospective jurors or may permit the attorneys for the parties to do so.” Fed. R. Crim. P. 24. The implication of this rule is that voir dire may be conducted by the Court, by counsel, or by some combination thereof. See Fed. R. Crim. Pro. 24(a). The court’s discretion under Rule 24(a) is not without limit, because it is “subject to the essential demands of fairness.” *Aldridge v. United States*, 283 U.S. 308, 310 (1931).

While attorney-conducted voir dire may not be essential to ensure such fairness in every case or situation, there are several reasons it will advance that goal in this case.

First, attorney-conducted voir dire will allow the most intelligent exercise of peremptory challenges. Voir dire examination serves the dual purpose of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges. *Mu'Min v. Virginia*, 500 U.S. 415, 431 (1991). The peremptory challenge, provided by statute in Rule 24(b), is recognized as “one of the most important of the rights secured to the accused,” *Pointer v. United States*, 151 U.S. 396, 408 (1894),

and often serves as the most critical tool in selecting an impartial jury. *Swain v. Alabama*, 380 U.S. 202, 218-219. ("The voir dire in American trials tends to be extensive and probing, operating as a predicate for the exercise of peremptories, and the process of selecting a jury protracted. The persistence of peremptories and their extensive use demonstrate the long and widely held belief that peremptory challenge is a necessary part of trial by jury.") A system "that prevents or embarrasses the full, unrestricted exercise of that right of challenge must be condemned." *Pointer v. United States*, 151 U.S. 396, 408 (1893).

For a peremptory challenge to serve its purpose, it must be intelligently exercised. This requires that the parties obtain sufficient information from the potential jurors upon which to base their challenges. Voir dire conducted solely by the court interferes with the intelligent exercise of peremptory challenges because the court is usually less familiar than counsel with the facts and nuances of the case. Without case-specific information necessary to identify the areas of questioning that must be explored further, the court may inadvertently fail to uncover prejudices that are pertinent to the evidence to be presented at trial. It is necessary to ask jurors specific questions about the type of case they could be hearing.

Before trial, attorneys know the evidence best and are in the best position to frame those questions with relevant follow-up.[2]

Supplementing the Court's examination with at least some attorney questioning is thus essential to provide the information necessary for the intelligent exercise of jury challenges.

Second, the traditional method of eliciting information from potential jurors—*i.e.*, asking a series of questions requiring a "yes" or "no" answer—yields insufficient information for the intelligent exercise of peremptory

---

[2] *United States v. Ible*, 630 F.2d 389, 395 (5th Cir. 1980) ("*[V]oir dire* may have little meaning if it is not conducted at least in part by counsel. . . . [I]t is the parties, rather than the court, who have a full grasp of the nuances and the strength and weaknesses of the case."); *Harold v. Corwin*, 846 F.2d 1148, 1153 (8th Cir. 1988) (Lay, J., concurring) ("Any busy trial judge must candidly admit that he or she knows far less of a given case at the time voir dire commences than the lawyers who have prepared the case for months or years. This reason alone compels the conclusion that lawyers should participate in voir dire."); *United States v. Ledee*, 549 F.2d 990, 993 (5th Cir. 1977) ("[W]e must acknowledge that voir dire examination in both civil and criminal cases has little meaning if it is not conducted by counsel for the parties. A judge cannot have the same grasp of the facts, the complexities and nuances as the trial attorneys entrusted with the preparation of the case. The court does not know the strength and weaknesses of each litigant's case. Justice requires that each lawyer be given an examination with at least some attorney questioning is thus essential to provide the information necessary for the intelligent exercise of jury challenges opportunity to ferret out possible bias and prejudice of which the juror himself may be unaware until certain facts are revealed.").

challenges. For example, when a prospective juror identifies herself as having been the victim of a crime, the court will typically ask whether this experience would tend to prejudice her. It would be more effective to probe the nature of the crime, her evaluation of the police investigation, and whether she made an identification and testified in court. But the judge is not in the best position to assess the need for such follow-up questions because he does not know the case or defense in detail such that he would realize when responses have opened areas of further inquiry. Without case-specific details, the judge is also unable to identify when either party may be drawing inferences from a prospective juror's response that could lead to an intelligent exercise of a peremptory strike with additional inquiry.

Further, the empirical research demonstrates that it does matter who asks the questions: judge-directed voir dire can be less revealing of juror prejudice than lawyer questioning. Susan E. Jones, *Judge-Versus Attorney-Conducted Voir Dire: An Empirical Investigation of Juror Candor*, 11 LAW & HUM BEHAV 131-146 (June 1987). Voir dire ("to see and speak the truth") is a process that plays a critical role in protecting the accused's right to a fair trial before an impartial jury. *Rosales-Lopez v. United States*, 451 U.S. at 188 (1981). Juror self-disclosure determines the effectiveness of voir dire.

In one of the largest studies of voir dire, funded by the U.S. Department of Justice, researchers sought to determine whether the level of juror self-disclosure was affected by the identity of the questioner or the method of questioning.

Perhaps the most important takeaway for judges considering whether to allow attorney-conducted voir dire is that "[d]uring a judge-conducted voir dire, jurors attempted to report not what they truly thought or felt about an issue, but instead what they believed the judge wanted to hear." Susan E. Jones, *Judge-Versus Attorney-Conducted Voir Dire: An Empirical Investigation of Juror Candor*, 11 LAW & HUM BEHAV. at 143. There exists a growing body of research to support that jurors are more willing to express their actual beliefs and opinions in response to questions from attorneys than when the same questions are asked by the judge. Frank P. Andreano, *Voir Dire: New Research Challenges Old Assumptions*, 95 Ill. B.J. 474, 475 (2007).

However, the prospective jurors did not view the attorneys with same level of authority as the judge, "which tended to result in a greater degree of self-disclosure." Susan E. Jones, *Judge-Versus Attorney-Conducted Voir Dire: An Empirical Investigation of Juror Candor*, 11 LAW & HUM BEHAV at 134. In that study, researchers created and observed simulated

*voir dire* procedures, some conducted by people posing as attorneys and others by people posing as judges.

Those playing each role also performed (with different experimental groups) their roles in different styles, both by changing the language they used and by changing their non-verbal performance. That is, those playing attorneys conducted *voir dire* in a formal style sometimes and in a more casual or personable style others; those playing judges did the same. By comparing the answers given during the *voir dire* to prior responses to surveys, the researchers concluded that "subjects were considerably more candid in disclosing their attitudes and beliefs about a large number of potentially important topics during attorney-led *voir dire*. Importantly, in none of the cases were judges more effective than attorneys." Susan E. Jones, *Judge-Versus Attorney-Conducted Voir dire: An Empirical Investigation of Juror Candor*, 11 Law & Hum. Behavior 131, 143 (1987).

Prospective jurors view the judge differently than any other person in the courtroom. The highly educated and formally trained judge sits on an elevated platform, in a serious, black robe overseeing an important legal process. A prospective juror may be intimidated by a judge, especially if they are unfamiliar with the legal system. When the obvious authority

figure poses questions about the prospective juror's viewpoints, those answers may be influenced by the desire to please or be accepted by the "robe-cloaked authority figure." Brian McKeen & Phillip Toutant, *The Case for Attorney-Conducted Voir Dire*, 90 MICH. B.J. 30, 31 (2011)("Judges, as robe-cloaked authority figures, may inadvertently chill jurors' responses to questions during voir dire.").

Answering to a highly esteemed figure, such as a judge, encourages potential jurors' tendency to offer the "socially desirable"—rather than the most accurate—response. Neil Vidmar, *When All of Us Are Victims: Juror Prejudice and "Terrorist" Trials*, 78 Chi.-Kent L. Rev. 1143, 1150 (2003) ("The tendency to provide such [socially desirable] answers can be enhanced by the authoritative presence of the judge."). While it is certainly not intentional, judges may be inadvertently chilling the responses by the prospective jurors during voir dire. McKeen & Toutant, *The Case for Attorney-Conducted Voir Dire*, 90 MICH. B.J. 30, 31 (2011).

The level of juror self-disclosure can vary widely depending on who is asking the questions, the style of the questioning, and the manner in which the questioning is conducted. Frank P. Andreano, *Voir Dire: New Research Challenges Old Assumptions*, 95 Ill. B.J. 474, 475 (2007). The

interactions between jurors and counsel are critical to the parties' decisions about the exercise of peremptory challenges, as it can lead to the discovery of biases against parties. Allowing counsel to question jurors is more effective for assessing bias because jurors are more likely to be honest about their views when questioned by attorneys rather than judges. Suggs & Sales, *Juror Self-Disclosure in the Voir dire: A Social Science Analysis*, 56 Ind. L.J. 245, 254 (1980) ("A large status differential between the interactants will most likely reduce perceived similarity and, in turn, the degree of self-disclosure.").

The reason for the difference in the perceptions may also be due to "the reciprocity effect," which suggests that the level of self-disclosure that any individual is likely to provide depends, to some degree, on how much that person receives in the way of self-disclosure from the interviewer. Frank P. Andreano, *Voir Dire: New Research Challenges Old Assumptions*, 95 Ill. B.J. 474, 475 (2007).

When attorneys provide some self-disclosure of personal information and then conduct the voir dire in a warm, "likeable" manner, the self-disclosure levels of the jurors rose. Jones, *Judge-Versus Attorney-Conducted Voir Dire: An Empirical Investigation of Juror Candor*, 11 Law & Hum Behav at

134 (June 1987).

Attorney-conducted voir dire may lead to an atmosphere where prospective jurors are more likely to provide meaningful self-disclosure and thus produce a more effective voir dire examination. *Id*. An effective voir dire examination will enable counsel to make informed decisions about exercising cause and peremptory challenges, creating a more impartial and balanced jury.

At least one federal judge, Judge Mark Bennett, has recognized the phenomenon:

> [E]mpirical research suggests that potential jurors respond more candidly and are less likely to give socially desirable answers to questions from lawyers than from judges. As a district court judge for over fifteen years, I cannot help but notice that jurors are all too likely to give me the answer that they think I want, and they almost uniformly answer that they can "be fair."[3]

[3] Judge Mark W. Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection: The Problems of Judge-Dominated Voir dire, the Failed Promise of Batson, and Proposed Solutions*, 4 Harv. L. & Pol'y Rev. 149, 160 (2010). *See also* Hans and Jehle*, Avoid Bald Men and People with Green Socks? Other Ways to Improve the Voir dire Process in Jury Selection*, 78 Chi.-Kent L. Rev. 1179, 1194 (2003) ("The judge's approval is important to a lot of prospective jurors and many will alter their responses or hide certain attitudes in order to be perceived favorably.").

The parties and the Court will need accurate and complete information from potential jurors to assess whether they are qualified to serve in a trial, and "there is no objective data to support the assertion that a judge is more likely than partisan counsel to obtain an impartial jury." Suggs & Sales, *Juror Self-Disclosure in the Voir dire: A Social Science Analysis*, 56 Ind. L.J. 245, 252 (1981).

Conversely, the judge's role of modeling neutrality, and of educating and instructing jurors, makes it difficult for the judge to simultaneously elicit jurors' true views. As Judge Bennett has recognized:

> There is also a temptation, not always resisted on my part, to pose questions with the intent of educating jurors about proper responses, in light of the presumption of innocence or other considerations in the trial. Thus, the trial judge is probably the person in the courtroom least able to discover implicit bias by questioning jurors.

J. Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection*, 4 Harv. L. & Pol'y Rev. at 160.

In sum, the traditional method of court-conducted voir dire significantly reduces the amount of information produced and may even influence prospective jurors' responses to questions.

Without a reasonable amount of information about the prospective

jurors, the defendant cannot realize his right to "select" the jury by for cause challenges and peremptory strikes. The impairment of the right to exercise peremptory challenges requires reversal of a conviction, without a showing of prejudice. *Lewis v. United States*, 146 U.S. 370, 376 (1892). There will be no possibility of such a reversal if the court permits counsel for each party a reasonable opportunity to conduct voir dire. A defendant who is permitted to ask his own voir dire questions is hardly in the position to complain about a failure of the Court to ask a particular question that he himself failed to ask. Allowing attorney-led questioning reduces post-trial speculation about what additional probing might have revealed about possible juror bias and creates a more reliable record for appellate review.

## III. Judicial efficiency can be maintained through attorney-conducted voir dire

The Court need not be concerned that allowing direct questioning by lawyers will result in excessive questioning of prospective jurors and an extended period of voir dire. By the time of this filing, the Court will have received each parties' proposed voir dire questions. The Court can thus readily supervise the permissible scope of questioning. The Court will be able to ensure follow-up questions posed by the parties during the

questioning are reasonably related to the previously approved questions.

It is often said that attorney-conducted voir dire is more time-consuming than judge-conducted voir dire. Howard, *Judge Versus Attorney-Conducted Voir Dire*, 1991 Utah Bar Journal 1 (1991). For example, one study established that the average time for judge-conducted voir dire was 64 minutes whereas attorney-conducted voir dire was 111 minutes. *Id* at 2. However, efficiency in judge-conducted voir dire can also result in formulaic, meaningless responses by the venire. Losing 47 minutes of time during a trial is trivial when compared to the benefit of selecting a more impartial jury. The minimal difference in time should thus be considered a relatively insignificant factor in determining whether to permit attorney-conducted voir dire. Further, if there is a concern that attorney-conducted voir dire would cause unreasonable delay in the trial, the Court can impose time limits on the parties.

The majority of states expressly provide for some attorney-driven voir dire in criminal trials. *See* Ala. R. Civ. P. 47; Alaska R. Cim. P. 24(a); Ariz. R. Crim. P. 18.5(f); Cal. Civ. Proc. Code § 223(b)(1); Colo. R. Civ. P. 47(a)(3); Conn. Gen. Stat. Ann. § 54-82f; Fla. R. Crim. P. 3.300(b); Ga. Code § 15-12-133; Haw. Rev. Stat. § 635-27; Idaho R. Civ. P. 47; Ill. Sup. Ct. R. 431; Ind. R.

Trial P. 47(D); *Elkin v. Johnson*, 260 Iowa 46, 49 (1967); Kan. Stat. § 22-3408; La. Const. art. I, § 17; Minn. R. Crim. P. 26.02.4; Miss. Code § 13-5-69; Mont. Code § 46-16-114; 2 Neb. Prac., Nebraska Trials § 6:15 (3d ed.); Nev. Rev. Stat. § 175.031; N.M. R. Crim. P. Dist. Ct. 5-606; N.Y. Ct. R. § 202.33; N.C. Gen. Stat. § 9-15; N.D. R. Crim. P. 24(a); Ohio R. Crim. P. 24(B); Okla. Stat. tit. 12 § 6; Or. R. Civ. P. 57; R.I. Super Ct. R. Crim. P. 24(a); S.D. Codified Laws § 23A-20-6; Tex. Code Crim. P. art. 35.17; Vt. R. Crim. P. 24(a)(3); Va. Super. Ct. R. 3A:14; Wash. CrR 6.4(b); W. Va. Trial Ct. R. 42.03; Wis. Stat. § 805.08; Wyo. R. Crim. P. 24(c). Judicial discretion can control the time and scope of attorney questioning, achieving dual goals of efficiency and fairness.

Attorney participation in *voir dire* is efficient too. Allowing counsel to ask relevant questions of jurors (with a limit on the length of time of questioning) is more expeditious than requiring counsel for both parties to propose specific questions, in writing, in advance, concerning each potential juror; to make requests throughout jury selection for follow-up questions of individual jurors; to make objections, for each individual juror questioned, regarding questions not asked; and to file motions throughout the process. Moreover, as discussed *ante*, allowing attorney-conducted *voir*

*dire* provides for a better appellate record while lessening the chance for reversal of a verdict due to deprivation of peremptory challenges or other possible errors during jury selection proceedings.

## IV. Implicit Social Bias Poses A Challenge to Jury Selection.

Implicit bias stands in stark contrast to impartiality. "Implicit bias" is a term of art referring to the formation of opinions based on the "relatively unconscious and relatively automatic features of prejudiced judgment and social behavior."[4] Drawing conclusions on the basis of "implicit bias" would contravene the core principle of impartiality of the Sixth Amendment.

The research group Perception Institute[5] offers the following

---

[4] *See* Brownstein, Michael, "Implicit Bias", The Stanford Encyclopedia of Philosophy (Spring 2017 Edition), Edward N. Zalta (ed.), available at https://plato.stanford.edu/entries/implicit-bias/. In other words, implicit bias draws conclusions based on pre-formed opinions rather than the evidence presented. In terms of juror impartiality, "[t]he theory of the law is that a juror who has formed an opinion cannot be impartial." *Morgan*, 504 U.S. at 727 (internal citation omitted).

[5] According to its website, the Perception Institute is a national consortium of social scientists, law professors, and advocates focusing on the role of the mind sciences in law, policy, and institutional practices. Its cofounders are Alexis McGill Johnson, of Princeton and Yale Universities, and Seton Hall University School of Law Professor, Rachel Godsil renowned author and lecturer on issues of implicit bias and racial anxiety. *See*

definition of "implicit bias" –

> Thoughts and feelings are "implicit" if we are unaware of them or mistaken about their nature. We have a bias when, rather than being neutral, we have a preference for (or aversion to) a person or group of people. Thus, we use the term "implicit bias" to describe when we have attitudes towards people or associate stereotypes with them without our conscious knowledge. A fairly commonplace example of this is seen in studies that show that white people will frequently associate criminality with black people without even realizing they're doing it.

The Sixth Circuit has explained the concept this way,

> The concept of "implicit bias" is defined, generally, as bias that is "not necessarily openly and explicitly expressed, but [is] harbored nonetheless." Implicit biases are "often not conscious, intentional, or maliciously—based," as opposed to explicit bias—generally defined as "bias that is openly expressed."

*United States v. Ray*, 803 F.3d 244, 260–61, n. 8 (6th Cir. 2015) (citing Melissa L. Breger, The (in)visibility of *Motherhood in Family Court Proceedings*, 36 N.Y.U. Rev. L. & Soc. Change 555, 560 (2012).

Massachusetts State Judge Kenneth Desmond has said, "[i]n the most basic sense, implicit bias is 'thoughts about other people you didn't know you had.' Consequently, it is often difficult for individuals who do not fall victim to the impact of certain biases to identify the ways they are

---

https://perception.org/about- us/team/. "Implicit Bias," Perception Institute, available at https://perception.org/research/implicit-bias/.

manifested." Hon. Kenneth V. Desmond, Jr., *The Road to Race and Implicit Bias Eradication*, Boston B.J., Summer 2016, at 3.

A plethora of scholarly articles support that implicit social bias poses a challenge to legal theory and practice, and to jury selection in particular because it can lead to erroneous assumptions that contravene the accused's Sixth Amendment right to a trial by an impartial jury.[6]

---

[6] *See e.g., Ray*, 803 F.3d at 260–61 (citing Mark W. Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection: The Problems of Judge–Dominated Voir Dire, the Failed Promise of Batson, and Proposed Solutions*, 4 Harv. L. & Pol'Y Rev. 149, 152 (2010); Jerry Kang & Kristin Lane, *Seeing Through Colorblindness: Implicit Bias and the Law*, 58 UCLA L. REV. 465, 465 (2010); Justin D. Levinson, *Forgotten Racial Equality: Implicit Bias, Decision-making, and Misremembering*, 57 DUKE L.J. 345, 345 (2007)). *See also* Anna Roberts, *(Re)forming the Jury: Detection and Disinfection of Implicit Juror Bias*, 44 Conn. L. Rev. 827, 833 (2012); Cynthia Lee, *A New Approach to Voir Dire on Racial Bias*, 5 UC Irvine L. Rev. 843, 844 (2015) ("'Implicit biases' are discriminatory biases based on either implicit attitudes-feelings that one has about a particular group-or implicit stereotypes-traits that one associates with a particular group.

They are so subtle that those who hold them may not realize that they do. . . African-Americans, for example, are stereotypically linked to crime and violence; their behavior is more likely to be viewed as violent, hostile, and aggressive than is the behavior of whites; and they are more readily associated with weapons than are whites."); Dale Larson, *A Fair and Implicitly Impartial Jury: An Argument for Administering the Implicit Association Test During Voir Dire*, 3 DePaul J. for Soc. Just. 139, 154 (2010) ("Implicit bias against socially underprivileged groups and outgroups is prevalent in our culture. As a result, there is a chance that implicit bias is present anytime a member of such a group is the defendant in a criminal trial. "); Siegfried C. Coleman, *Reliance on Legal Fiction: The Race-Neutral*

## V. Ferreting Out Implicit Bias is Essential to the Selection of an Unbiased Jury in This Case.

Mr. Smith's own race-related traits and characteristics may evoke all types of presuppositions in the minds of the jurors, including that he is a black male who is heavily tattooed, and how wears his hair in a dreadloc style. Such presuppositions need to be ferreted out and frankly discussed to allow for a fair trial. As mentioned above, Mr. Smith wears his hair in locs. Locs or dreadlocks are commonly associated with the Rastafari, a predominantly Black religious movement that originated in Jamaica and which is known, in part, for its ceremonial use of marijuana.

Although Mr. Smith is neither Rastafari nor a drug user, prior to the prospective jurors hearing, seeing or fairly assessing the evidence, they could perceive Mr. Smith as culpable based solely on an implicit bias that associates drugs with a dreadlock hairstyle.

---

*Juror*, 41 S.U. L. Rev. 317 (2014) ("This article highlights the notion that these unchecked biases are alive and well in all jurors as an innocent and necessary human characteristic and advocates the position that these biases should be acknowledged and formally addressed."); Hon. Kenneth V. Desmond, Jr., *The Road to Race and Implicit Bias Eradication*, Boston B.J., Summer 2016, at 3 ("Throughout the past several decades, State and Federal appellate courts have candidly acknowledged the implicit biases of litigants and jurors.").

Direct and thorough inquiry into the potential jurors' perceptions would sift out this type of implicit bias and identify prospective jurors who may have predetermined key issues relevant to Mr. Smith trial. Such inquiry will also assist both the Court and the lawyers to determine whether the prospective jurors can consciously put aside any such bias.

## VI. Thorough Voir Dire on Implicit Race Bias is Important to the Proper Exercise of Peremptory Challenges.

The Constitution prohibits exercising racially discriminatory peremptory challenges. *See Georgia v. McCollum*, 505 U.S. 42, 48 (1992). Under *Batson v. Kentucky,* 476 U.S. 79 (1986), and its progeny, including *Georgia v. McCollum*, 505 U.S. 42 (1992), and *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127 (1994), no party can exercise peremptory challenges based on personal race biases, gender biases or prejudices. Under the prevailing case law, where there is a *prima facie* case of racial discrimination in the exercise of a party's peremptory challenges, a party "must articulate a racially neutral explanation for the peremptory challenge." *McCollum,* 112 S.Ct. at 2359; *see Batson,* 476 U.S. at 98. To enable Mr. Smith to exercise his peremptory challenges intelligently and adequately, and to ensure that the challenges can be supported by a race and gender-neutral explanation,

individualized voir dire is essential.

The Supreme Court's decision in *J.E.B*. declared:

> If conducted properly, voir dire can inform litigants about potential jurors, making reliance upon stereotypical and pejorative notions about a particular gender or race both unnecessary and unwise. Voir dire provides a means of discovering actual or implied bias and a firmer basis upon which the parties may exercise their peremptory challenges intelligently. *See, e.g., Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 602 . . . (1976) (Brennan, J., concurring in judgment) (voir dire 'facilitate[s] intelligent exercise of peremptory challenges and [helps] uncover factors that would dictate disqualification for cause'); *United States v. Whitt*, 718 F.2d 1494, 1497 (CA10 1983) ('Without an adequate foundation [laid by voir dire], counsel cannot exercise sensitive and intelligent peremptory challenges').

*J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 143–44 (1994).

As Justice O'Connor pointed out in her concurring opinion in *J.E.B.,* litigants can no longer simply rely on their intuition in exercising peremptory challenges. Fairness dictates that the lawyers are permitted the opportunity to voir dire the jury panel to ensure that a fair and impartial jury is selected consistent with the dictates of *Batson* and its progeny.

## VII. Conclusion

Allowing the attorneys to follow the Court's voir dire with a limited,

attorney-conducted voir dire would be an appropriate procedure to protect Mr. Smith's Sixth Amendment right to an impartial jury.[31] The procedure requested in this motion would encourage honest disclosure by the venire and will not unduly protract the trial process. The government is opposed to this motion. For the reasons provided, it is respectfully requested that this Court allow counsel to conduct reasonable voir dire in the above-entitled case.

Dated: This 26th day of August, 2026.

Respectfully submitted,

*/s/ Josh D. Moore*
State Bar No. 520028
*(Admitted Pro Hac Vice)*
Attorney for Marielle Smith

*/s/ J. Wesley Bryant*
State Bar No. 091621
*(Admitted Pro Hac Vice)*
Attorney for Marielle Smith

FEDERAL DEFENDER PROGRAM, INC.
Suite 1500, Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303
(404) 688-7530
Email: josh_moore@fd.org
Wes_Bryant@ fd.org

CERTIFICATE OF SERVICE AND COMPLIANCE WITH LR 5.1B

I hereby certify that the foregoing pleading has been formatted in Book Antiqua 14 pt., in accordance with Local Rule 5.1B and that on this date, I electronically filed this pleading with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorney of record:

Stephen C Hoch
DOJ-USAO
210 Park Avenue
Suite 400
Oklahoma City, OK 73102

Dated: This 26th day of August, 2026.

/s/ *Josh D. Moore*
State Bar No. 520028
Attorney for Marielle Smith

/s/ *J. Wesley Bryant*
State Bar No. 091621
Attorney for Marielle Smith